IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITSUI O.S.K. LINES, LTD., | Case Nos. 11-cv-02861-SC |
| Plaintiff, | 10-cv-05591-SC |
| v. | FINDINGS OF FACT AND |
| SEAMASTER LOGISTICS, INC., SUMMIT LOGISTICS INTERNATIONAL, INC., KESCO CONTRAINER LINE, INC.; KESCO SHIPPING, INC., and DOES 1 through 20, | CONCLUSIONS OF LAW |
| Defendants. | |

## **INTRODUCTION**

These consolidated actions consist of two suits: Case Numbers 11-cv-02861-SC (the "trucking case" or "'61 Case") and 10-cv-05591-SC (the "freight re-rating case" or "'91 Case"). The Court held a bench trial in these matters from January 28, 2013 through February 19, 2013. By this Memorandum of Decision, the Court issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Plaintiff Mitsui O.S.K. Lines ("MOL") is a licensed vessel-operating common carrier ("VOCC"). Its primary business is the

1  carriage of goods between the United States and foreign ports,

2  including Hong Kong.  MOL entered into service contracts to carry

3  goods for various non-vessel-operating common carriers

4  ("NVOCC(s)"), including the defendants in this action, Kesco

5  Container Lines, Inc. ("Kesco Container"), Kesco Shipping, Inc.

6  ("Kesco Shipping"), SeaMaster Logistics, Inc. ("SeaMaster US"), and

7  Summit Logistic International, Inc. ("Summit US") (collectively,

8  "Defendants").[1]  In Section II of the Findings of Fact, the Court

9  lays out the interrelationship between these parties, their

10 principals, and other key players.

11      In the trucking case, MOL asserts that Defendants engaged in a

12 conspiracy to induce MOL to pay for fake truck moves between

13 factories in inland China, typically Shenzhen, to ports in and

14 around Hong Kong.  This so-called "Shenzhen door arrangement" was

15 managed and organized by Michael Yip, the head of MOL's Hong Kong

16 office.  Yip allegedly struck a deal with Defendants: He would

17 provide them with more space on MOL's ships and lower surcharges,

18 and, in return, Defendants would request that MOL book truck moves

19 from inland factories to Hong Kong ports through Rainbow

20 Transportation Co. Ltd. ("Rainbow"), a fake trucking company

21 suggested by Yip.  Due to a complicated paper trail and a series of

22 payments and kickbacks, it appeared that Rainbow was actually

23 providing trucking, but, in reality, Defendants or their customers

24 made other arrangements to move their goods from the factory to the

25 port.  The end result was guaranteed space and lower shipping

26 charges for Defendants and revenues for Rainbow.  In connection

27 _____

28 [1] In accordance with the Court's request, the parties submitted
post-trial briefs.  '61 Case ECF Nos. 255 ("SM Br."); 253 ("MOL
Br."); 256 ("Kesco Br."); 257 ("SM Damages Br.").

**United States District Court**
For the Northern District of California

1  with the trucking case, MOL asserts federal claims under the

2  Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18

3  U.S.C. § 1962, as well as claims for intentional and negligent

4  misrepresentation and civil conspiracy.

5      As part of the trucking case, MOL also asserts that SeaMaster

6  US, Summit US, and a former defendant, American Global Logistics

7  LLC ("AGL"), engaged in a scheme similar to the Shenzhen door

8  arrangement in the United States.  The scope of this alleged scheme

9  is much smaller than the Shenzhen door arrangement.  MOL reached a

10 settlement with AGL on the eve of trial, and has offered little

11 evidence on this aspect of the case.

12     In the freight re-rating case, MOL asserts that SeaMaster US

13 and Summit US obtained ocean carriage at less than the rates

14 established by MOL in its published tariff or the service contracts

15 on file with the U.S. Federal Maritime Commission ("FMC").  These

16 undercharges are allegedly the result of either errors on the part

17 of MOL or incorrect information provided by SeaMaster US and Summit

18 US.  In connection with these undercharges, MOL asserts claims for

19 violation of the Shipping Act of 1984 (the "Shipping Act"), 46

20 U.S.C. § 40101 et seq., breach of maritime contract, and

21 accounting.  SeaMaster US and Summit US contend that they provided

22 accurate information, that MOL properly computed their freight

23 rates in the first instance, and that, in any event, MOL is now

24 legally barred from collecting additional freight.

25     For the reasons set forth below, the Court makes the following

26 findings with respect to the trucking case.  The Court finds for

27 MOL and against SeaMaster US, Summit US, and Kesco Container on

28 MOL's claims for intentional misrepresentation, negligent

**United States District Court**
For the Northern District of California

1   misrepresentation, and conspiracy, but only as those claims relate

2   to the Shenzhen door arrangement.  The Court finds for Defendants

3   on MOL's claims under RICO.  As to the freight re-rating case, the

4   Court finds for SeaMaster US and Summit US on MOL's claims for

5   violations of the Shipping Act, breach of maritime contract, and

6   accounting.[2]

7

8                          **FINDINGS OF FACT**

9   **I.    THE OCEAN TRANSPORTATION BUSINESS**

10         1.    Before discussing the specifics of the case, the Court

11  reviews some general but relevant facts pertaining to the ocean

12  transportation business.  VOCCs like MOL operate ships that carry

13  cargo over water between foreign ports and the United States.  46

14  U.S.C. §§ 40102(6), (17).  A VOCC issues a bill of lading or

15  waybill (a non-negotiable short form of the bill of lading)

16  evidencing the particulars of the shipment.  A VOCC bill of lading

17  or waybill is often referred to as the "master bill of lading."

18         2.    NVOCCs like SeaMaster US, Summit US, and Kesco Container

19  contract with the public to provide transportation of cargo by

20  water between foreign ports and the United States.  The NVOCC

21  assumes responsibility for the transportation from the place of

22  receipt to the place of delivery stated on its bill of lading,

23  which is referred to as the "house bill of lading."  The NVOCC does

24

25

---

26  [2] In their post-trial brief, Kesco Container and Kesco Shipping
    request attorney's fees pursuant to a provision in Kesco
27  Container's service contract with MOL.  Kesco Br. at 37-38.  Due to
    the briefing schedule set forth by the Court, MOL has not had an
28  opportunity to respond.  The Court finds the request procedurally
    improper.  If any party wishes to request attorney fees, then it
    should file a motion in accordance with the Court's local rules.

                                    4

United States District Court
For the Northern District of California

not, however, operate ocean vessels.  An NVOCC obtains space on a
VOCC's vessel and re-sells that space to its own customers.

3.   Actual cargo owners are often referred to as beneficial
cargo owners ("BCO(s)").  Many BCOs do business directly with
VOCCs.  Others prefer to utilize the services of NVOCCs, which
provide additional services, such as cargo management, trucking,
warehousing, freight forwarding, and logistics.

4.   Some NVOCCs purchase transportation from VOCCs, while
others purchase services from other NVOCCs to obtain lower freight
rates.  Thus, one VOCC and two or more NVOCCs may handle the same
shipment.  For example, in several of the shipments involved in
this case, MOL sold its transportation services to SeaMaster US,
which sold those services to AGL, another NVOCC.  AGL then sold
those services to a BCO.  MOL issued a master bill of lading to
SeaMaster US, which issued a SeaMaster house bill of lading to AGL,
which then issued an AGL house bill of lading to the BCO.

5.   VOCCs and NVOCCs sometimes contract to carry cargo
overland, either from an inland place of receipt to the port of
loading, or from the port of discharge to an inland place of
delivery, or both.  Carriage that includes both an inland leg and
an ocean leg is called "through" or "intermodal transport."  See 46
U.S.C. § 40102(25).  Thus, VOCCs and NVOCCs may offer carriage of
cargo from port to port, from door to door (e.g., from an inland
point of origin in Asia to a final inland destination in the United
States), from door to port, or from port to door.  The cargo
shipments involved in this case were generally in sealed twenty-
foot or forty-foot ocean containers.

6.    In providing intermodal services, the VOCC or NVOCC may utilize the services of subcontractor railroads, truckers, and other inland carriers.  For example, an NVOCC may provide transportation service from Shenzhen, China to Las Vegas, Nevada by utilizing a motor carrier in China for the Shenzhen to Hong Kong leg (a.k.a. a "door move" or "truck move"), an ocean carrier from Hong Kong to Oakland, California, and a motor carrier in the United States for the Oakland to Las Vegas leg.  In this example, the VOCC's master bill of lading would show the port of Hong Kong as the place of receipt and the port of Oakland as the place of delivery.  The NVOCC's house bill of lading would show Shenzhen as the place of receipt and Las Vegas as the place of delivery.  The VOCC could offer this same intermodal service.  The VOCC or NVOCC may charge these services to their customers showing the cost of each leg, or in a single all-inclusive "through rate."

7.    "Freight" is the charge for carrying cargo from point A to point B.  The price for transporting a shipment may include, in addition to the freight itself, add-on charges, e.g., a bunker (fuel) surcharge, a peak season surcharge, or a trucking fee.  The price may also include a surcharge known as the origin receiving charge.  Freight can be prepaid or collect, or partly both.  When the freight is prepaid, the shipper pays the freight at the port of loading.  For a freight collect shipment, the consignee (i.e., the party to whom the shipment is sent) pays the freight before the VOCC releases the cargo at the place of delivery.

8.    Both VOCCs and NVOCCs operating in the United States are legally required to publish tariffs showing their freight rates, charges, classifications, rules, and practices for their service

routes.  Tariffs may provide some sort of general freight rate, sometimes described as cargo NOS ("not otherwise specified"), cargo FAK ("freight all kinds"), or GDSM ("general department store merchandise").  The tariff may also contain specific commodity rates for particular port pairs, for example, a specific rate for transporting men's boots from Hong Kong to Oakland.  Such rates are often called "bullet rates."

9.  A "service contract" is a written contract between a shipper (either a BCO or an NVOCC) and a VOCC in which the shipper commits to provide a certain minimum quantity of cargo over the term of the contract, and the VOCC commits to certain rates and levels of service to carry that cargo.  46 U.S.C. § 40102(20). Like the tariff, the service contract may include general freight rates and bullet rates.  However, service contract freight rates are generally lower than the corresponding tariff freight rates. Service contracts, including rates, are to be filed with the FMC.

II.  **THE PARTIES AND KEY PLAYERS**

    A.  **The MOL Group and Michael Yip**

10.  Plaintiff MOL is a Japanese VOCC.  MOL uses general agents to perform its operational functions in Asia and in the United States.  MOL (HK) Agency Ltd. ("MOL HK") is currently MOL's general agent subsidiary for its "South China territory," which encompasses a number of provinces and cities in South China, including Shenzhen, as well as Hong Kong.  Exs. D-519, D-526, D-527; Tr. 1964-65.  MOL HK is based in Hong Kong.  Prior to March 27, 2009, MOL's general agent subsidiary in Hong Kong operated under the name MOL (Asia) Limited.  Exs. D-511, D-522.

11. Yip Kwok-Wai, a.k.a. Michael Yip, was the district director of MOL HK from sometime in 2009 through 2011, and before that he was MOL's General Manager of Sales and Customer Service for Hong Kong and South China. Tr. at 1962-65. As district director of MOL HK, Yip was in charge of MOL's Hong Kong and South China Sales team, which allocated shipping space among MOL's customers. Tr. at 2040.

12. As discussed at length in Section III of the Findings of Fact, Yip was the mastermind behind the Shenzhen door arrangement, though he is not a party to this action. Yip left MOL in or around March 2011. D-550. Masaru Satose, who replaced Yip, testified that Yip was not fired by MOL. Tr. at 1965. MOL continued to list Yip as a director on its annual financial return as late as March 27, 2011. Ex. D-551 at 12.

13. Though Yip is the central figure in the trucking case, he did not testify at trial and his present whereabouts are unknown. MOL declined to comment on whether Hong Kong authorities are pursuing criminal charges against Yip because, under Hong Kong law, it is a criminal offense to disclose such information to a third party. See Hong Kong Prevention of Bribery Ordinance § 30.

**B.  The Kesco Companies and their Principals**

14. Defendant Kesco Container was incorporated in New York in 1994 and primarily deals with ocean freight business. Tr. at 1748. Starting in 2000, Defendant Kesco Container had multiple service contracts with MOL. Tr. at 1755. Defendant Kesco Shipping was formed in 1996 as a local handling agent for air shipments coming into California. Tr. at 1749-50. There is no evidence that Kesco

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Shipping was involved in the business of ocean carriage or that it

2  had a service contract with MOL. See Tr. at 1757.

3      15.  Defendants Kesco Container and Kesco Shipping were

4  created and owned by three partners: Simon Chan, Kevin Chang, and

5  Edmond Fong (collectively, the "Kesco partners"). Id. The Kesco

6  partners also owned at least three other companies bearing the name

7  Kesco: Kesco Container Line (HK) LTD ("Kesco Container HK"),[3] Kesco

8  Shipping Corp., and Kesco Transportation (HK) Ltd. Tr. at 1764-65;

9  Ex. D-806. More often than not, the attorneys and the witnesses at

10 trial referred to "Kesco" generally without distinguishing the

11 different Kesco companies. Hereinafter, where the identity of a

12 Kesco company is unclear, the Court uses the term "Kesco."

13     16.  Raymond Cheng was a key employee at Kesco Container HK,

14 Kesco Container's local handling agent in Hong Kong. Tr. at 1749.

15 Cheng joined the organization in 1997 as an operation manager and

16 was later promoted to assistant general manager and then to general

17 manager. Tr. at 1005-06. While Cheng worked for Kesco Container

18 HK, he negotiated service contracts with MOL on behalf of Kesco

19 Container. Tr. at 1755. The Kesco partners eventually sold their

20 interest in all five Kesco companies to Cheng in 2010. Tr. at

21 1765.

22     17.  In or around 1995, the Kesco partners entered into an

23 agreement to become the air freight handling agent for a company

24 known as Fashion Merchandising, Inc. ("FMI"), which performed

25 warehousing and trucking services for a number of garment

26 manufacturers. Tr. at 1750. In 1997, Kesco Container began to

27

28 [3] Kesco Container HK was formed in or around 1989 as Kesco Freight
   (HK) Ltd and later changed its name. Ex. D-805.

service FMI's ocean transportation needs.  <u>Id.</u>  Around that time,
FMI developed a direct customer relationship with the Jones Apparel
Group ("Jones Apparel"), a large, well-known garment company.  <u>Id.</u>
As a result, FMI became Kesco's biggest customer, comprising over
50 percent of its business.  Tr. at 1750-51.

18.  At all relevant times, Robert O'Neill was key executive
and part owner of FMI.  Tr. at 1711-13.  O'Neill became president
of FMI around the time that the company acquired Jones Apparel as a
customer.  Tr. at 1727.

19.  O'Neill generally relied on his brother-in-law, Geoffrey
Tice, to manage Jones Apparel's ocean transportation needs.  <u>Id.</u>
Tice held senior positions at FMI and Kesco Container, working at
FMI from 1995 to 1996, at Kesco Container from 1996 to 1998, at FMI
from 1998 to 2002, and again at Kesco Container from 2002 to 2006.
Tr. at 611-617.  Tice also worked at a predecessor to Summit US
from 2006 to 2008 and returned to Kesco thereafter.  O'Neill
described Tice as FMI's "implanted employee" at Kesco.  Tr. at
1727.  At one point, Kesco Container agreed to reimburse FMI for
the cost of Tice's salary.  Tr. at 1730; Ex. P-106.  Along with
Cheng, Tice handled Kesco Container's service contract negotiations
with MOL.  Tr. at 1755.

20.  In or around 2000, Jones Apparel acquired Nine West, a
fashion wholesale and retail company that primarily sells footwear
and accessories.  Tr. at 70.  Around the same time, Kesco Container
entered its first service contract with MOL.  Tr. at 1755; Ex. D-
801.  Though MOL's rates were higher than other carriers at the
time, Jones Apparel wanted Kesco Container to use MOL for its

1   business because Jones Apparel had a pre-existing relationship with

2   MOL.  Tr. at 1757.

3       21.  Over the years, Kesco Container and FMI entered into a

4   number of agency agreements.  Tr. at 390.  Under a 1998 agency

5   agreement, the parties agreed to share profits from import

6   shipments and also agreed that FMI would exclusively represent

7   Kesco Container as its sales agent in the United States for the

8   sales and marketing of Kesco Container's ocean transportation

9   services.  Ex. P-105.  The parties executed another agency

10  agreement in 2002, through which they again agreed to share profits

11  from import shipments.  Ex. P-106.

12      22.  In or around 2006, a group of companies known as the

13  Summit Group (discussed in more detail below), acquired FMI for

14  approximately $114 million.  Tr. at 1435-36.  The Summit Group

15  informed the Kesco partners that it intended to take over the Jones

16  Apparel business, and the Kesco partners agreed to cooperate with

17  the transition.  Tr. at 617.  In the early stages of the

18  transition, Kesco was to be the origin handling agent in Asia for

19  the Jones Apparel business, and the Summit Group was to take over

20  the role of sales agent and destination handling agent in the

21  United States.  Tr. at 1038-43.

22      23.  The transition did not go as quickly as planned.  Kesco

23  continued to act as the origin handling agent for the Jones Apparel

24  business from 2006 until late 2008 or early 2009, when the Jones

25  Apparel business was transitioned to a joint venture between Summit

26  US and the Kesco Partners.  See Findings of Fact ("FF") ¶¶ 32-33,

27  infra.  From 2006 through 2008, the 2002 Kesco-FMI Agency Agreement

28  governed the division of profits between Kesco and the Summit

**United States District Court**
For the Northern District of California

1  Group.  Tr. at 1731-32.  That is, the Summit Group received any

2  profits that FMI would have been entitled to under the Kesco-FMI

3  agreement.

4      24.  In sum, Kesco's key customer between 2000 and 2006 was

5  Jones Apparel.  In 2006, the newly formed Summit Group acquired

6  FMI, Kesco's former strategic partner, and began to transition the

7  Jones Apparel business away from Kesco.  The transition ultimately

8  culminated in a joint venture between the Kesco partners and Summit

9  US in 2009.

10     **C.**   **The SeaMaster and Summit Companies and their Principals**

11     25.  Defendants SeaMaster US and Summit US were incorporated

12 in 2008, although similarly named companies with the same officers

13 and directors existed before them.  One of those similarly named

14 companies was the Summit Group, which was comprised of Summit

15 Global Logistics, Inc. ("SGL") and its subsidiary companies.  SGL's

16 subsidiaries included SeaMaster Logistics, Inc., SeaMaster

17 Logistics (Holdings) Ltd. ("SeaMaster HK"),[4] Summit Logistics

18 International, Inc., Tug New York, Inc., and, as discussed above,

19 FMI.  See Tr. at 1415-1417.  The Summit Group provided NVOCC

20 logistics services for cargo coming into the United States from

21 Asia, as well as U.S. trucking and warehousing services.  Tr. at

22 1416.

23     26.  SGL and the Summit Group were founded by Robert Agresti,

24 along with a number of others, in November 2006.  Tr. at 1415-16.

25

26 ─────────────────
[4] SeaMaster Logistics (Holdings) Ltd. changed its name to Summit
27 International Logistics (HK) Ltd. in June 2009.  Ex. P-9.  The
   company's name was then changed to Summit International Logistics
28 Ltd. in July 2009 and to SeaMaster Global Forwarding (HK) in March
   2011.  Id.  For ease of reference, the Court refers to the company
   as "SeaMaster HK."

**United States District Court**
For the Northern District of California

After SGL acquired FMI in 2006, O'Neill continued to act as president of the FMI International division, which was the U.S. division of the company. Tr. at 1713. Tice, who joined the Summit Group soon after its formation, characterized Summit Group as "the former FMI group"; Tr. at 617, however, it is unclear who at the FMI group was actually involved with the creation of SGL.

27. Another key player at the Summit Group was Jerry Huang, who was Managing Director of SeaMaster HK from March 2007 through March 2011. Ex. P-9; Tr. at 834-35. Before joining SeaMaster HK, Huang had several years of experience in the shipping industry, including a position as general manager of Hecny Shipping Limited, another NVOCC. Tr. at 834-35.

28. In January 2008, SGL and its subsidiaries filed for Chapter 11 bankruptcy. Tr. at 1416; Ex. D-507. In November 2008, the Chapter 11 proceeding converted into a Chapter 7 liquidation proceeding. Tr. at 1417. TriDec Acquisition Co., Inc. ("TriDec") purchased the assets -- but not the liabilities -- of SGL and its subsidiaries in March 2008 for approximately $56.5 million. Tr. at 1418-19. TriDec was formed in 2008 and had only seven preferred stockholders, including O'Neill and Huang. Tr. at 1443. Agresti was also actively involved in TriDec's management. See Tr. at 1446.

29. After the asset acquisition, TriDec formed Defendants SeaMaster US and Summit US, both of which continued the operations of former SGL subsidiaries. Tr. at 1419-20, 1423. The bankruptcy and the TriDec acquisition did not interrupt the operations of the former Summit Group companies. The same managers -- including Agresti, O'Neill, and Huang -- continued to run the companies

**United States District Court**
For the Northern District of California

1  before, during, and after the bankruptcy. Tr. at 1448-49.

2  Throughout this process, these companies continued to accept

3  customer bookings, issue bills of lading, and manage the movement

4  of cargo. Tr. at 1449.

5      30. SeaMaster US was incorporated in April 2008 in California

6  and focused on the "NVOCC wholesale business," meaning that it

7  primarily serviced other NVOCCs. Ex. D-509; Tr. at 1420-21.

8  TriDec also acquired SeaMaster HK to serve as the agent for

9  SeaMaster US in Asia. Tr. at 1422. SeaMaster HK was incorporated

10 in Hong Kong and continued to be run by Huang. Tr. at 1422-23.

11 Because SeaMaster US had only two employees, SeaMaster HK and Huang

12 were primarily responsible for running the day-to-day operations of

13 the NVOCC wholesale business. See Tr. at 1635-36. In fact,

14 SeaMaster US's service contracts with MOL list Huang as managing

15 director of SeaMaster US. Exs. P-3, P-5. Huang was also on the

16 Board of Directors for SeaMaster US from 2008 through 2010. Tr. at

17 1636. As the witnesses and attorneys often did not distinguish

18 between the two, the Court refers to SeaMaster US and SeaMaster HK

19 together as "SeaMaster."

20     31. Summit US was incorporated in March 2008 in Delaware and

21 had a principal place of business in New Jersey. Ex. D-508; Tr. at

22 1424. Agresti was initially appointed as CEO and he was later

23 replaced by O'Neill. Tr. at 906, 1425. While SeaMaster provided

24 services to other NVOCCs, Summit US primarily serviced BCOs. Tr.

25 at 1425. Thus, the Summit US business was referred to as "the

26 retail business." Id. From May 2008 through the end of 2008,

27 Summit US used Kesco Container HK as its agent in Hong Kong. Tr.

28 at 1090-91.

**United States District Court**
For the Northern District of California

32.   In November 2008, Summit US and a company owned by the three Kesco Partners, Allied Business Limited ("Allied"), formed a joint venture to handle the Jones Apparel business and to ensure a smooth transition of that business to Summit US.   Tr. at 399-400, 1427-28.   The joint venture was known as Summit Logistics International (SCM HK) Limited ("Summit SCM").   Tr. at 1427-28. Summit SCM was incorporated in Hong Kong, and Summit US and Allied each owned 50 percent of the business.   Id.; Ex. D-513.

33.   In January 2009, Summit SCM commenced operations and supplanted Kesco Container HK as the agent in Hong Kong for Summit US shipments.   Tr. at 1094, 1427-28.   Cheng, the general manager of Kesco Container HK, was initially hired as a consultant to assist with the start-up of Summit SCM's operations, and Winnie Lau, who formerly worked under Cheng at Kesco Container HK, was later hired to run day-to-day operations.   Tr. at 1428.   Lau continued to report to Cheng at Kesco after she moved to Summit SCM.   Tr. at 212.

34.   In February 2010, Toll Global Forwarding Holdings (U.S.A.) ("Toll") acquired TriDec, along with SeaMaster US and Summit US, through a stock sale.   Tr. at 1431-32.   The shareholders and creditors of TriDec received the proceeds of the sale.   Tr. at 1432.   MOL's financial expert, David Nolte, estimates that Toll acquired TriDec for about eleven times TriDec's earnings before interest and tax, a.k.a. EBIT.   Tr. at 990-91, Ex. P-163.

35.   In summary, the Summit Group was created in 2006 and formed a number of subsidiaries, including two companies which would later become defendants SeaMaster US and Summit US.   The Summit Group also acquired Kesco's key partner, FMI.   The Summit

**United States District Court**
For the Northern District of California

1   Group went through a strategic bankruptcy in 2008, after which

2   defendants SeaMaster US and Summit US were formed.  SeaMaster HK

3   and its general manager, Huang, were primarily responsible for

4   SeaMaster US's wholesale business.  Summit US ran the retail side

5   of the NVOCC business and ultimately took the Jones Apparel

6   business away from Kesco.  In 2010, Toll acquired SeaMaster US and

7   Summit US.

8

9   **III.  THE SHENZHEN DOOR ARRANGEMENT**

10       36.  Now that the key players have been established, the Court

11  turns to the Shenzhen door arrangement, the primary aspect of MOL's

12  trucking case.  As discussed below, Michael Yip first proposed the

13  arrangement to Raymond Cheng at Kesco Container HK in 2000.  The

14  arrangement with Cheng expanded in 2006 when Kesco began booking

15  shipments under the Summit Group's contracts with MOL, and expanded

16  again when Summit US entered its joint venture with the Kesco

17  partners.  Jerry Huang entered into a similar arrangement with Yip

18  on behalf of SeaMaster in 2009.  Defendants terminated the

19  arrangements in 2010 when MOL inexplicably raised its trucking

20  fees, rendering the arrangement infeasible.

21       **A.   Michael Yip and Raymond Cheng Agree to the Shenzhen Door**

22            **Arrangement**

23       37.  The Shenzhen door arrangement was conceived sometime in

24  2000, when Jones Apparel acquired Nine West, and Jones Apparel's

25  need for ocean services increased significantly.  Tr. at 634-36.

26  As discussed above, FMI used Kesco's NVOCC services to secure ocean

27  transportation for Jones Apparel cargo.  FF ¶¶ 17, 20-21 supra.

28  Geoffrey Tice credibly testified that there were various

**United States District Court**
For the Northern District of California

discussions at Kesco and FMI about strategies for obtaining the freight rates needed to secure the Jones Apparel business and also obtaining "adequate space protection," an arrangement to ensure that MOL reserved adequate space for Jones Apparel cargo on its ships.[5]  Tr. at 634-35.  Cheng, who was then assistant general manager of Kesco Container HK, took these concerns to Yip at MOL, and Yip recommended the Shenzhen door arrangement.  Tr. at 1012-1013.

38.  At his deposition, Cheng described the arrangement in detail.  Under the arrangement, Yip agreed to provide space protection for Kesco cargo.  Tr. at 1012, 1019.  In return, Cheng agreed that Kesco would declare false Shenzhen door shipments, meaning that Kesco would request that MOL arrange trucking for Kesco cargo between inland origins, typically Shenzhen, and ports in and around Hong Kong.  Id.  In reality, Kesco did not require any trucking from MOL, because the cargo was tendered by the manufacturer or exporter at the port.  Tr. 634-36, 1012.  Cheng also agreed that Kesco would pay MOL an "arbitrary," an additional charge for the trucking between Shenzhen and the port.  Yip agreed that Kesco would be fully reimbursed for that arbitrary.  Finally and most importantly, Cheng agreed to nominate Rainbow Transportation Co. Ltd. ("Rainbow"), a Hong Kong trucking company suggested by Yip, to perform the purported truck moves.  Tr. at 1014; Ex. P-84.

---

[5] When customers' cargo exceeded space on MOL's ships, cargo was not loaded on a first-come-first-serve basis.  Tr. at 2040. Instead, MOL's local offices would generally make the decision as to how to allocate space among customers.  Tr. at 2040-41.  In Hong Kong and Shenzhen, decisions about space allocation were often left to Yamby Lun, the head of the MOL HK sales department, who reported to Yip.  Tr. at 2037, 2040, 20702-73.

17

**United States District Court**
For the Northern District of California

39.   MOL paid Rainbow for the door moves, but in reality, Rainbow never performed any trucking.  Tr. at 1013-14, 2127-29. Instead, it merely received payments from MOL and made payments to Kesco Container HK.  Kesco Container HK, in turn, would kick back funds to Kesco Container US, which ultimately paid MOL for the door moves.  MOL took a loss on the trucking leg of the Shenzhen door moves, meaning that MOL paid more to Rainbow than it charged Defendants for trucking.  <u>See</u> Tr. 606-607; Ex. D-595.  Thus, Rainbow received more from MOL than it paid to Defendants.  It is unclear what Rainbow did with the difference.  At trial, MOL suggested that Yip owned Rainbow, though it did not present any direct evidence to support such a finding.

40.   In sum, under the Shenzhen door arrangement, Kesco received adequate space on MOL's ships in return for declaring false Shenzhen door shipments and was fully compensated by Rainbow for payments made to MOL for the non-existent door moves. Additionally, the arrangement allowed Kesco to avoid higher surcharges.  Tr. at 1020-21.  The origin receiving charge at Shenzhen was about $269 per forty-foot container, while the origin receiving charge at Hong Kong was about $369.  Tr. at 1021. Accordingly, Kesco saved about $100 per forty-foot container by booking Hong Kong port shipments as Shenzhen door shipments.

41.   Cheng testified that the arrangement was approved by Paul Chan, who was the general manager of Kesco Container HK at the time.  Tr. at 183, 1013.  The Kesco partners deny that they were aware of the Shenzhen door arrangement at any time prior to this litigation.  Tr. at 1244, 1262-64, 1759-1762.
///

42.   The parties vigorously dispute whether MOL sanctioned this arrangement and whether Cheng believed that Yip was acting on MOL's behalf or for his own purposes.   The Court finds that Yip was acting adversely to MOL's interests, and that Cheng knew it.   The arrangement was obviously designed to avoid detection at MOL.   It required Kesco to misrepresent the place of receipt of its cargo and to pay MOL for non-existent trucking to maintain the illusion that Rainbow was actually providing trucking.   If, as Defendants suggest, MOL had wanted to provide Kesco with lower rates and free space protection in order to keep its business, then MOL presumably could have done so without funneling money through a fake trucking company and asking Kesco to declare false places of receipt.

43.   When asked whether he believed Yip was allowed to make the arrangement, Cheng testified: "I don't know.   I remember I know him at that time is -- general manager?   I forgot. Honestly, I forget his title.   But I talked with him.   I got whatever I want." Tr. at 1036-37.   Throughout his testimony, Cheng could not offer a coherent explanation as to why the arrangement required Kesco to make false representations to MOL if Yip had the authority to offer such a deal.   There is no evidence that Cheng ever discussed the arrangement with anyone else at MOL or that there was a written contract between MOL and Kesco documenting the agreement.   When asked how he knew that Rainbow would reimburse Kesco for the arbitrary, Cheng testified: "If you [are] doing business, you just try [a] couple of weeks.   If the money [is] not back, I will challenge someone, 'Hey, where is my money?'"   Tr. at 1019.

///

///

19

**United States District Court**
For the Northern District of California

**B.   Raymond Cheng, Geoff Tice, and Winnie Lau Carry out the Shenzhen Door Arrangement at Kesco and Summit**

44.   Cheng informed Tice about the arrangement soon after it was agreed upon in 2000.  Tr. at 636.  At some point, Cheng also directed Winnie Lau, who then worked under him at Kesco Container HK, to book all port shipments as Shenzhen door, and then to bill Rainbow for the arbitrary.  Tr. at 1089.  Lau was either fully aware of the Shenzhen door arrangement or declined to investigate despite the red flags.  Lau testified that she was aware that Kesco was paying MOL for door moves that never actually took place, but that she never asked Cheng or anyone else at Kesco about the issue. Tr. at 1099-100.  When asked what Kesco was paying MOL for if no door moves were taking place, Lau could only respond that she was "not sure."  Tr. at 1099.

45.   Based on the information and documents prepared by Kesco Container HK in Hong Kong, the master bills of lading issued by MOL reflected a false "Shenzhen door" place of receipt.  Tr. at 1016, 1100.  The Court finds that Kesco did not over-charge its own customers as a result of the arrangement and that the house bills of lading issued by Kesco to its customer accurately represented the true place of receipt.  See, e.g., Ex. P-111.  The Court also finds that Kesco did not share these house bills of lading with MOL or inform MOL that its master bills of lading were incorrect.

46.   The arrangement continued uninterrupted through June 2010.  Over the course of the arrangement, Tice had numerous negotiations with Frank Costa, MOL's director of sales, about Kesco's Shenzhen arbitrary, i.e., the rates for trucking between Shenzhen and the port.  Tr. at 65, 72-76.  Costa testified that MOL

**United States District Court**
For the Northern District of California

1   was willing to lower the arbitrary for Kesco because Jones Apparel

2   was a high-profile account.  Tr. at 72-75.

3        47.  During his discussions with Costa, Tice never disclosed

4   the Shenzhen door arrangement.  Tr. at 76-77.  When asked at his

5   deposition, Cheng could not explain why he and Tice were concerned

6   about reducing the Shenzhen arbitrary when they knew that it would

7   be reimbursed by Rainbow.  See Tr. at 1066.  The Court finds that

8   Cheng, Tice, and Yip needed to keep Kesco's arbitrary lower than

9   MOL's payments to Rainbow in order to make the arrangement

10  feasible.

11       48.  After the Summit Group acquired FMI in 2006, Kesco

12  Container HK continued to act as the handling agent for Jones

13  Apparel cargo.  Lau also continued to book false Shenzhen door

14  shipments, but those shipments were consigned to the Summit Group

15  and its subsidiaries.  Tr. at 406, 1088-89.  During this period,

16  Tice continued to negotiate the Shenzhen arbitrary on behalf of the

17  Summit Group.  Tr. at 89.  It is unclear whether Cheng, Lau, or

18  Tice informed anyone else at Summit about the arrangement.  In

19  2007, Kesco also booked false Shenzhen door shipments under

20  SeaMaster's service contract with MOL, Ex. P-263, though Jerry

21  Huang testified that he was unaware of the arrangement at that

22  time, Tr. at 859, 1633.  Agresti and O'Neil also denied that they

23  had any knowledge of the Shenzhen door arrangement prior to this

24  lawsuit.  Tr. at 1435, 1723-25.

25       49.  As discussed above, the Summit Group filed for bankruptcy

26  in early 2008, and SeaMaster US and Summit US were incorporated

27  soon thereafter.  In 2008, Summit US signed its own service

28  contract with MOL, and, for a time, false Shenzhen door shipments

were carried under that service contract.  Ex. P-268.  During this period, Kesco Container HK acted as origin handling agent for Summit US, just as it had done for the Summit Group.  Tr. at 1090. There is no evidence that anyone at Summit US was aware that Kesco was booking port shipments as Shenzhen door shipments at that time.

50.  After the Summit Group bankruptcy, Tice went back to Kesco, and Samantha Scott took over his role in negotiating the Shenzhen door rates on behalf of Summit US.  Tr. at 89-91, 1109-1113.  Scott credibly testified that she was not aware of the arrangement when she negotiated the Shenzhen door rates.  Tr. at 1110-11, 1121.

51.  In January 2009, the newly formed Summit SCM -- a joint venture between Summit US and a company owned by the Kesco partners -- took over Kesco Container HK's role as origin handling agent. Tr. at 1094, 1427-28.  As discussed above, Summit SCM hired Lau to run day-to-day operations and hired Cheng as a consultant.  FF ¶ 33.  On January 1, 2009, Cheng wrote to Yip on behalf of Kesco Container HK, informing him that Summit SCM wanted to appoint Rainbow to provide trucking services from Shenzhen.  Ex. D-514. From January 2009 to June 2010, Summit SCM took part in the arrangement in substantially the same manner as Kesco, with Lau booking Shenzhen door shipments at the direction of Cheng.  Tr. at 188, 212.  It is unclear whether anyone at Summit SCM other than Lau was aware of the Shenzhen door arrangement during that time.

52.  By 2010, Cheng, Tice, and Lau had booked false Shenzhen door shipments through Kesco, Summit US, and Summit SCM.  Between 2000 and 2010, thousands of shipments were booked under the Shenzhen door arrangement.  Exs. P-262, P-263, P-264.  During this

**United States District Court**
For the Northern District of California

1   period, MOL paid Rainbow at least $8,283,394.11 as a result of

2   Shenzhen door shipments booked by or through Kesco Container,

3   Summit US, the Summit Group, and Summit SCM.  See id.

4       **C.**   **Michael Yip and Jerry Huang Agree to the Shenzhen Door**

5            **Arrangement and Huang Carries out the Arrangement at**

6            **SeaMaster**

7       53.  Jerry Huang credibly testified that SeaMaster did not

8   enter into the Shenzhen door arrangement until early 2009.  Tr. at

9   1545-46.  Around that time, Huang was concerned that MOL was not

10  providing enough vessel space for SeaMaster's shipments to the

11  United States.  Tr. at 1542.  He shared these concerns with a

12  number of MOL staff, including Rebecca Yang, the MOL sales

13  representative assigned to SeaMaster; David Prado, an MOL vice

14  president and SeaMaster's main contact in Hong Kong; and Rich

15  Hiller, MOL's head of trade management.  Tr. at 95, 99, 897, 1541-

16  43.

17      54.  Huang testified that Prado and Hiller were unable to

18  resolve SeaMaster's space issue.  Tr. at 897, 911.  In fact, Prado

19  had offered to block additional space for SeaMaster through a

20  "fixed space allocation" plan, but Huang rejected the offer because

21  of the higher rates involved.  Tr. at 964-965.  After his

22  discussions with Prado, Huang went back to Yang, who suggested that

23  he speak with Yip.  Tr. at 965-66, 1544-45.  Yang was later

24  terminated for passing along confidential information to MOL's

25  customers.  Tr. at 54.

26      55.  Huang testified that he met with Yip in Hong Kong in

27  early 2009, at which time Yip indicated that he could solve

28  SeaMaster's space problem if Huang agreed to the Shenzhen door

23

1    arrangement.  Tr. at 1544-45.  The arrangement proposed by Yip was

2    substantially similar to the one he had proposed to Cheng nine

3    years earlier: SeaMaster would declare false Shenzhen door

4    shipments and pay an arbitrary for the non-existent trucking, and

5    in return Yip would provide space protection and a trucking company

6    would reimburse SeaMaster for the arbitrary.  Tr. at 1545-46.  Yip

7    did not reveal that the trucking company was Rainbow until a

8    subsequent telephone conversation.  Tr. at 1546.  As in the

9    arrangement with Cheng, SeaMaster was able to obtain lower origin

10   receiving charges by booking Hong Kong port shipments as Shenzhen

11   door shipments.  Id. at 1594.

12       56.  Again, the parties dispute whether Yip had the authority

13   to enter into such an arrangement and whether Huang was aware that

14   Yip lacked authority.  For many of the same reasons discussed

15   above, FF ¶¶ 42-43 supra, the Court finds that Yip lacked the

16   authority, and Huang knew it.  As in the arrangement with Cheng,

17   Yip's arrangement with Huang was clearly structured to avoid

18   detection by other MOL personnel.  Further, Huang's prior

19   conversations with Hiller and Prado established that MOL was

20   unwilling to provide the type of deal that Yip was offering.

21   Hiller and Prado offered to provide SeaMaster with space protection

22   for additional money, whereas Yip essentially offered to provide

23   free space protection along with lower fees than SeaMaster was

24   already paying.  Yip's deal was obviously too good to be true.

25       57.  Huang testified that he agreed to the Shenzhen door

26   arrangement because it was suggested by Yip, because he had been

27   directed to Yip by Yang, because he needed to resolve SeaMaster's

28   space issue, and because it had the added benefit of allowing

**United States District Court**
For the Northern District of California

SeaMaster to avoid higher origin receiving charges.  Tr. at 1551-54.  When asked whether he found the arrangement strange, Huang responded: "Well, of course, I did feel that it was strange.  However, it's because these instructions came from somebody high up in MOL, so I just did what he told me to do."  Tr. at 1554.  But the structure of the arrangement, including the requirement that SeaMaster declare a false place of receipt, must have alerted Huang that Yip was not acting on behalf of MOL.  Further, in his deposition, Huang admitted that he suspected that Yip had an interest in Rainbow and that he was aware that MOL would be taking a loss on the truck moves.[6]  Tr. at 931, 935, 1580.  Huang also admitted that he was aware that Yip was operating a freight forwarder outside of MOL.  Tr. at 1580.  Despite these red flags, Huang did not discuss the arrangement with anyone at MOL except Yip and Yang, Tr. at 919-21, 925-26, 1583-84, suggesting that he wanted the arrangement to remain secret.

58.  O'Neil and Agresti, who both headed Summit US at various points between 2008 and the Toll acquisition, testified that they were unaware of the arrangement and were otherwise unaware that SeaMaster booked port shipments as Shenzhen door shipments.  Tr. at 1432-22, 1723-22.

59.  On or around March 5, 2009, Huang instructed his assistant in Hong Kong, Eva Chan, to start booking false Shenzhen door shipments under the Shenzhen door arrangement.  Tr. at 1590-91.  As a result of the Shenzhen door arrangement, MOL provided

---

[6] Huang later changed his testimony, stating that he was unaware how much MOL was paying to Rainbow for the Shenzhen door shipments. Tr. at 1571, 1652.  In light of Huang's earlier statements, his later testimony is not credible.

**United States District Court**
For the Northern District of California

more shipping space to SeaMaster.  SeaMaster paid MOL for the purported Shenzhen door moves at the rates set forth in the parties' service contracts.  Tr. at 1639-40.  SeaMaster HK periodically provided Rainbow with a list of the Shenzhen door shipments and the amounts that SeaMaster had paid for trucking, after which Rainbow reimbursed SeaMaster for those truck payments. Exs. D-576, D-577; Tr. 1464-1468.

60.  As a result of the information provided by SeaMaster, MOL issued master bills of lading that incorrectly identified shipments' place of receipt as Shenzhen.  <u>See, e.g.</u>, Ex. P-129. The house bills of lading that SeaMaster issued to its own customers correctly identified a port place of receipt, not Shenzhen.  <u>See e.g.</u>, <u>id.</u>; Tr. at 1567.  The Court finds that SeaMaster did not overcharge its own customers as a result of the Shenzhen door arrangement.  <u>See</u> Tr. at 1567.

61.  Several months after the arrangement commenced, in an email dated October 12, 2009, Yip stated that he needed Huang to sign an agreement concerning the Shenzhen trucking "to cope with MOL's out sourcing vendor requirement.  Just a paper for recording purposes."  Ex. D-530.  A few days later, Yip's assistant sent Huang an "inland trucking agreement for outbound goods."  Ex. D-531 (the "Inland Trucking Agreement").  The Inland Trucking Agreement and its attachments set forth various trucking rates that SeaMaster was to pay MOL, but make no mention of the fact that SeaMaster would book false Shenzhen door shipments, that no physical trucking would actually take place, or that Rainbow would reimburse SeaMaster for all trucking charges.  <u>See</u> <u>id.</u>  The Court finds that

the Trucking Agreement was yet another attempt by Yip to cover up the Shenzhen door arrangement and that Huang knew it.

62.   Huang signed the trucking agreement, but admits that he never actually read it.  Tr. at 596.  When asked why, Huang explained that he was not concerned with the trucking rates because, under his arrangement with Yip, he knew that Rainbow would reimburse SeaMaster for the Shenzhen arbitrary: "I am a businessman and I made an agreement with Michael Yip -- actually, it was Michael Yip who made the offer for all of the trucking fees that we paid extra, all of that would be given back to us."  Tr. at 1594. Huang offered no coherent explanation as to why the Trucking Agreement was necessary when MOL was not in fact providing any trucking.

63.   Between 2009 and 2010, SeaMaster booked thousands of shipments through the Shenzhen door arrangement.  Ex. P-263. SeaMaster booked these shipments through its offices in Hong Kong. Tr. at 1561-62.  As a result of the false information provided by SeaMaster, MOL paid Rainbow at least $1,080,073.07 for trucking that never actually took place.  Exs. P-262, P-263, P-264.

64.   Centurion Logistics Management ("Centurion") also booked a number of Shenzhen door shipments under SeaMaster's service contracts with MOL.  See Ex. P-263.  Centurion was one of SeaMaster's co-loaders, an NVOCC that booked shipments under SeaMaster's existing service contracts.  Tr. at 846, 1666.  Huang testified that Centurion misused SeaMaster's service contracts with MOL by booking shipments under those contracts without SeaMaster's authorization.  Tr. at 868-69, 885.  In light of other evidence adduced at trial, this testimony is not credible.  In July 2009,

**United States District Court**
For the Northern District of California

27

**United States District Court**
For the Northern District of California

1  MOL notified SeaMaster that a number of shipments had been booked

2  under its service contracts which did not list SeaMaster or Summit

3  US as the shipper or consignee.  Ex. P-62 at SM2761.  A number of

4  these flagged shipments were booked by Centurion.  Tr. at 1683.

5  Abby Liu, Huang's assistant, later responded to MOL's inquiry, but

6  did not identify the Centurion shipments as a problem.  Tr. at

7  1688; Ex P-62 at SM2748.

8      **D.**   **The Termination of the Shenzhen Door Arrangement**

9      65.  SeaMaster, Summit US, Summit SCM, and Kesco stopped

10  booking Shenzhen door shipments at the end of June 2010, when MOL

11  removed the Shenzhen door and through rates from its service

12  contracts, effectively increasing the inland arbitrary rate to $400

13  per container.  See Tr. 1568-69, 1618-20.  Before these amendments,

14  the Shenzhen arbitrary rate ranged from about $80 to $200 per

15  container.  See Ex. P-112; P-123; P-316; P-317.  No explanation

16  for these amendments was offered at trial.

17      66.  When Defendants discovered the increase in the Shenzhen

18  door rates, they each contacted their MOL service representatives

19  with concerns.  Specifically, Scott contacted MOL on behalf of

20  Summit US, Ex. P-112; Tice contacted MOL on behalf of Kesco, Ex. P-

21  123; and Huang contacted MOL on behalf of SeaMaster, Ex. P-317.  In

22  these communications, Scott, Tice, and Huang did not mention the

23  Shenzhen door arrangement or the fact that Defendants had been

24  reimbursed by Rainbow for Shenzhen door moves in the past.  See

25  Exs. P-112, P-123, P-317.

26      67.  The Court finds that Huang's reaction to the increase in

27  the Shenzhen door rates further corroborates that he was aware Yip

28  was acting adversely to MOL.  On June 10, 2010, Yip emailed Huang

**United States District Court**
For the Northern District of California

about the increase, stating: "Must keep SZ [Shenzhen] via HK [Hong Kong] at $250." Ex. P-316. After the two talked about the matter over the telephone, Huang instructed his staff to continue to book Shenzhen door shipments until the service contract was formally amended at the end of June. Ex. P-190. Huang also emailed Prado, SeaMaster's sales representative at MOL, about reducing the Shenzhen door rates, noting, "I really do not think $400 is a realistic number." Ex. P-317. Significantly, Huang's email did not mention his earlier conversation with Yip, nor was Yip copied on the communication. Id.

68. At trial, Huang testified that SeaMaster ceased booking Shenzhen door shipments because there was no longer a "space problem" on MOL's vessels. Tr. at 1568-69. This testimony is simply not credible. Huang's June emails with Yip and with his staff clearly show that the increase in MOL's inland trucking rates was the only reason SeaMaster ceased booking shipments through Shenzhen door. The Court finds that, as a result of the increase, Rainbow could no longer afford to reimburse SeaMaster or the other Defendants for MOL's trucking fees and, thus, the Shenzhen door arrangement was no longer feasible.

**E.   MOL's Knowledge and Notice of the Shenzhen Door Arrangement**

69. The Shenzhen door arrangement spanned ten years and encompassed thousands of shipments moving through multiple ports in and around Hong Kong. Defendants argue that, in light of its scope, persons at MOL other than Yip and Yang must have been aware of it. MOL produced little evidence on this issue at trial. Warren Minck, MOL's internal auditor, testified that he began

1    investigating the Shenzhen door arrangement in March 2011 after MOL

2    received a tip from another NVOCC that was doing business with

3    SeaMaster.  Tr. at 457, 2183.  The results of that internal

4    investigation were not disclosed at trial or through discovery, due

5    to issues of attorney-client privilege.  See Tr. at 339-45.

6         70.  While it is certainly possible that Yip enlisted other

7    MOL employees to carry out the arrangement, the Court finds it

8    implausible that any of these other employees would have been

9    acting in the interest of MOL.  As discussed at length above, Yip

10   went to great lengths to keep the Shenzhen door arrangement

11   confidential.  Indeed, Yip needed Defendants to declare false

12   places of receipt and make payments on non-existent door moves in

13   order to make Rainbow appear legitimate and to keep the arrangement

14   going.

15        71.  Further, Defendants' suggestion that the Shenzhen door

16   arrangement was widely known at MOL is belied by much of the

17   evidence.  Cheng, Lau, and Tice did not discuss the Shenzhen door

18   arrangement with anyone at MOL except Yip.  In addition to speaking

19   to Yip, Huang also communicated the arrangement to Yang, who MOL

20   later terminated for passing along confidential information to its

21   customers.  There is no mention of the arrangement in any of MOL's

22   service contracts or service contract amendments or in any bills of

23   lading.  See, e.g., Exs. P-192 to 209.  Consistent with MOL's claim

24   that it was ignorant of the arrangement, MOL's master bills of

25   lading falsely reflect that Defendants' cargo was received by MOL

26   at Shenzhen door.  While Defendants' house bills of lading

27   accurately reflect that the shipments were received at the port,

28   there is no evidence that those house bills were shared with MOL or

**United States District Court**
For the Northern District of California

1   that Defendants alerted MOL of the inconsistency between the house

2   bills that they issued and master bills that they received.  <u>See</u>

3   Tr. at 1100-01.

4        72.  Additionally, the evidence suggests that MOL was not in a

5   position to discover the arrangement when Defendants' cargo was

6   delivered to the port by someone other than Rainbow.  The Hong Kong

7   marine terminals used by MOL were owned and operated by third

8   parties, Tr. at 2174-76, and the terminal owners handled and lifted

9   cargo onto MOL's ships, Tr. at 2028-29.  Further, Defendants, not

10  MOL, would coordinate with the vendor about dropping off full

11  containers at the port and picking up the empty ones.  Tr. at 252-

12  56.

13       73.  Regardless of when MOL discovered the Shenzhen door

14  arrangement, the Court finds that MOL had reason to investigate

15  Rainbow much earlier than it did and that a reasonable

16  investigation would have uncovered the arrangement.  As Defendants

17  point out, MOL knew or should have known that it was taking a loss

18  on Shenzhen door moves because it was paying Rainbow less than it

19  was charging Defendants.  The loss should have been obvious to

20  MOL's auditors through MOL's various databases, including its

21  StarNet and CostMaster systems.  Tr. at 108-09, 1982.  Further, the

22  loss should have been suspicious for a number of reasons: (1) MOL

23  typically made a profit on such door moves, Tr. at 1971-72, 2033-

24  34; (2) Rainbow's rates were higher than other truckers in the

25  market, Tr. at 1985-86, 2131; and (3) Shenzhen door moves were "not

26  the norm," Tr. at 2038.

27       74.  Despite these red flags, MOL did not investigate whether

28  Rainbow was a legitimate trucking company before 2011.  Tr. at

2030.  A background check would not have been out of the ordinary, as MOL did investigate other vendors.  Tr. at 2030.  Further, in 2003, MOL had committed to performing background checks on its vendors as part of its agreement with the U.S. Customs and Border Protection, specifically the Customs-Trade Partnership Against Terrorism ("C-TPAT") agreement.  Tr. at 60.  Under C-TPAT, MOL had, among things, agreed to "[e]nsure that contract companies who provide vessel related services (e.g., contract security) commit to C-TPAT Security Recommendations [and] [p]eriodically review the security commitments of th[ose] providers . . . ."  Ex. D-502.

## IV.   U.S. TRUCKING DIVERSIONS

75.  MOL alleges that SeaMaster US and Summit US engaged in a scheme similar to the Shenzhen door arrangement in the United States.  This alleged scheme is connected to SeaMaster US and Summit US shipments that were consigned to AGL when they reached the United States.  AGL, another NVOCC, was formerly a defendant in this case, but it reached a settlement agreement with MOL shortly before trial.  According to MOL's counsel, the domestic trucking case involves no more than a few dozen shipments and about $75,000 in damages.  MOL devoted little time to its claim for U.S. trucking diversions at trial and ignored the issue altogether in its post-trial brief, though it has yet to formally abandon the claim.

76.  Due to a lack of evidence on the subject, the Court reviews the allegations from MOL's pleadings to provide some background.  In its second amended complaint, MOL alleges that Summit US and SeaMaster US declared a false destination for a number of AGL shipments.  '61 Case ECF No. 72 ("'61 SAC") ¶ 25.

United States District Court
For the Northern District of California

For example, in a shipment discharged at the port of Jacksonville, Florida, MOL would be told that the place of delivery by truck was Tampa, Florida (and was charged accordingly), when in fact the cargo would be transported a much shorter distance to Orlando, Florida.  Id.  MOL alleges that AGL used a company called "Expedited" to make these deliveries.  Id. ¶ 27.  MOL asserts damages for the difference between the trucking rates for the final destination in the master bill of lading (e.g., Tampa) and the actual place of delivery (e.g., Orlando).

77.  James Briles, AGL's director of operations, testified that he mistakenly booked a number of shipments to the wrong destination.  Tr. at 1343.  Jerry Huang, the head of SeaMaster HK, credibly testified that SeaMaster did not play any role in arranging U.S. trucking for AGL shipments.  Tr. at 1575.  Huang also credibly testified that SeaMaster never requested that U.S. truckers change the place of delivery from the one shown on MOL's master bills of lading.  Id.  The Court finds that MOL did not present any credible evidence linking Huang or anyone else at SeaMaster or Summit US to the alleged U.S. trucking diversions.

**V.   THE FREIGHT RE-RATING CASE**

78.  MOL's freight re-rating case is predicated on the allegation that MOL undercharged SeaMaster US and Summit US for more than 19,000 shipments carried under their 2008, 2009, and 2010 service contracts with MOL.[7]  These undercharges were allegedly the

---

[7] Specifically, MOL is suing under service contract 8084273A08 (the "A08 service contract"), which ran from May 15 2008 to June 19, 2009; service contract 8084273A09 (the "A09 service contract"), which ran from June 5, 2009 to June 30, 2010; and service contract 8084273A10 (the "A10 service contract"), which ran from June 28

33

**United States District Court**
For the Northern District of California

1   result of either mistakes on the part of MOL staff or deliberate

2   false descriptions of cargo by SeaMaster US and Summit US.  In an

3   attempt to prove these undercharges, MOL commissioned TAG ICIB

4   Services ("TAG") to conduct an audit.  SeaMaster US and Summit US

5   argue that MOL staff correctly rated the subject shipments in the

6   first instance.  They also argue that TAG auditors used an overly

7   restrictive definition of "GDSM," one of the rating categories

8   frequently used by MOL rating staff.

9           **A.   MOL's Standard Rating Procedures**

10          79.  Before turning to the TAG audit, the Court first reviews

11  MOL's standard procedures for assessing freight for shipments

12  booked by customers like SeaMaster US and Summit US.  The process

13  begins when an MOL customer books a shipment with the appropriate

14  MOL office.  That office then enters the booking data into MOL's

15  computer system, StarNet.  See Tr. at 306, 440.  Shortly before MOL

16  receives the customer's cargo for carriage, the customer emails or

17  faxes MOL shipping instructions, which include a description of the

18  cargo.  Tr. at 1329, 1792; Ex. P-58 at SM0292.  MOL then enters

19  that data into StarNet.

20          80.  Based on the information provided by the customer, MOL

21  Information Processing Services ("MOLIPS"), an MOL subsidiary,

22  calculates the freight due for the shipment.  Tr. at 1789, 2043.

23  MOLIPS makes this calculation by comparing the information provided

24  by the customer with the rates set forth in the customer's service

25  contract.  Tr. at 1792.  The SeaMaster Service Contracts contained

26

27  ─────────────────────────────────────────────

28  2010 to June 14, 2011 (collectively, the "SeaMaster Service
    Contracts").  SeaMaster is the "first named shipper" on these
    contracts, and Summit US is listed as an affiliate shipper in the
    appendices of the contracts.

hundreds or thousands of freight rates, which varied depending on the port pair (i.e., the port of loading and the port of discharge), whether the shipment was door-to-door or port-to-port, and the cargo commodity, among other things. <u>See</u> Tr. at 56-57; Exs. P-194, P-195. Amendments to these service contracts were often negotiated every week, generally to add new port pairs. Tr. at 1519. MOLIPS determines the potentially applicable rates set forth in the service contracts by using a computer program called GT Nexus. Tr. at 1795-96.

81. Under MOL guidelines, when two or more rates are applicable to a given shipment and one rate is more specific than the others, MOLIPS applies the most specific rate. Ex. P-68 at 14; Tr. 1797-98. For example, the rate for "Canned Pineapple" is more specific than the rate for "Canned Fruit" or "Canned Goods," Ex. P-268 at 14, though determining which rate is the most specific is not always so straightforward. In the event that two rates are equally applicable to a shipment, the shipper is entitled to the lowest of the applicable rates. <u>Id.</u>; Tr. at 58. If no applicable rate is listed in the service contract, then MOLIPS will apply the MOL tariff rates filed with the FMC, which are substantially higher than the rates listed in the service contract. Tr. at 36-37, 57, 100, 1516.

82. After MOLIPS selects the freight rate, it sends the customer a "freighted" draft bill of lading or similar record containing the shipment data and the freight amount. Tr. at 1807, 1940-41. If the customer agrees that the freight amount is correct, the customer sends an approval back to MOLIPS. Tr. at 1807-08. If the customer indicates that it disagrees with the

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   rate, then MOLIPS takes a second look and sends a message back to

2   the customer with either a revised freight amount or a statement

3   that the original amount was correct.  Tr. at 1941.  After the

4   customer provides confirmation, MOL issues the final master bill of

5   lading.  Tr. at 1807-08.

6      83.  Pursuant to MOL guidelines, when a customer raises a

7   rating issue, MOLIPS will advise the sales and pricing department

8   of the issue and "[s]ales and pricing are to review/amend the

9   [service] contract to resolve this issue and possibly offer an

10  incentive on future shipments." Ex. P-68 at 15.  Thus, where the

11  SeaMaster Service Contracts did not contain a rate for a particular

12  commodity that SeaMaster US or Summit US intended to ship, MOL

13  would sometimes amend the service contracts to add that commodity.

14  See Tr. at 2024-25.  When the amendment was not filed on time and

15  the higher tariff rate was applied to the shipment, MOL had a "VIP

16  program" whereby future shipments would be discounted to offset the

17  higher tariff rate applied to the initial shipment.  See id.  For

18  example, where SeaMaster US paid $200 more on a shipment because

19  the service contract amendment did not take effect in time, MOL

20  would provide it with a $200 discount on future shipments.

21     84.  MOL instituted a number of procedures to ensure the

22  accuracy of its rating process.  A second member of the MOLIPS

23  rating team would often double-check the rate applied to a

24  particular shipment.  Tr. at 1810-11.  When questions about

25  applicable rates arose, rating personnel could contact their team

26  leader and team leaders could forward their questions to the MOL

27  Sales Group or the MOL Trade Management Group.  Tr. at 1933-35,

28  1939-40, 2051-52.  Additionally, MOL performs internal audits to

verify that MOLIPS is applying the correct freight rates.  Tr. at
2162-65.  Geoffery Chan, MOL Asia's General Manager of Internal
Audit, testified that he could not recall that these audits
uncovered any errors in the freight charged to SeaMaster US or
Summit US.  Tr. at 2167.  Chan also testified that he did not find
a pattern of regular or systematic errors in calculating freight
for MOL shipments out of China.  Id.

**B.   The TAG Audit**

85.  In connection with this litigation, TAG reviewed over
19,000 shipments carried under the SeaMaster Service Contracts in
an attempt to determine whether MOLIPS assessed the correct freight
amounts in 2008, 2009, and 2010.  Despite the fact that MOL's
internal auditors did not find any errors in these freight
assessments, the TAG audit found that MOL undercharged SeaMaster US
and Summit US by over $15 million.  For the reasons set forth
below, the Court finds that MOL provided insufficient evidence to
show that the freight assessments performed by the TAG auditors are
more reliable than those performed by MOLIPS.  In fact, the
evidence suggests that the MOLIPS freight assessments are more
reliable.

86.  The only TAG employee to testify about the results of the
TAG audit was Frances Gaskins-Kennedy, an audit manager who
supervised the review of the SeaMaster US and Summit US shipments.
Gaksins-Kennedy reviewed the entire audit but personally audited
only about 10 to 12 percent of the shipments.  Tr. at 669.  She
could not identify which of the shipments she audited herself.  Id.
The other auditors worked from home and were paid according to the
number of shipments they audited.  Tr. at 684-85.  Gaskins-Kennedy

**United States District Court**
For the Northern District of California

1    initially testified that the average shipment could take thirty

2    minutes to audit, Tr. at 671, but later admitted that each auditor

3    audited about one-hundred shipments per day, Tr. at 685, suggesting

4    that some corners may have been cut.

5         87.  Further, the reliability of the data used in the TAG

6    audit is questionable.  As part of the audit, TAG attempted to

7    compare the information listed in MOL's master bills of lading with

8    the information listed in SeaMaster US and Summit US's house bills

9    of lading.  There is no evidence that TAG considered SeaMaster US

10   and Summit US's shipping instructions, which is what MOLIPS

11   primarily used when making its rating determinations.  Further,

12   because TAG initially did not have access to the house bills of

13   lading, it had to obtain the information second hand, through a

14   private online service called Datamyne.  Ex. P-215; Tr. at 664.

15   Datamyne collects, reformats, and commercializes official trade

16   data it receives from government sources, including U.S. Customs

17   and Border Protection.  Tr. at 6-7.  These government agencies

18   collect their data from private parties, such as SeaMaster US and

19   Summit US.  Tr. at 21.  Datamyne does not check the validity of the

20   data reported by these government agencies.  Tr. at 21-22.  Thus,

21   while MOLIPS' freight assessments were based on information

22   directly provided by SeaMaster US and Summit US, TAG's assessments

23   were based on information passed from Defendants to the government

24   to a third party.

25        88.  While MOLIPS personnel had more experience rating

26   shipments, the TAG auditors did not review any records concerning

27   how MOLIPS determined the freight rate in the first instance.  Tr.

28   at 786.  Nor did TAG make any attempt to determine how MOLIPS

1   personnel arrived at the freight initially charged.  Tr. at 787.

2   Instead, they merely rated the shipments themselves based on

3   information retrieved from StarNet and Datamyne.  As the TAG

4   auditors did not testify, and Gaskins-Kennedy did not show

5   specifically how TAG audited each shipment, it is unclear how TAG

6   reached its conclusions.

7        89.  The validity of TAG's conclusions is further undermined

8   by internal inconsistencies in the audit.  In more than twenty

9   instances, two or more TAG auditors accidentally rated the same

10   shipment and reached different conclusions.  Tr. at 804-808.  For

11   example, one TAG auditor found that a shipment of bed covers had

12   been rated correctly, while another auditor concluded that the same

13   shipment was undercharged by $5,499.  Tr. at 805-06; Ex. D-596.

14   When questioned about these inconsistencies, Gaskins-Kennedy

15   admitted that, in certain instances, two competent auditors looking

16   at the same bill of lading could come up with different

17   conclusions.  Tr. at 810.  Based on this and other evidence

18   produced at trial, the Court finds that determining the appropriate

19   freight for a particular shipment sometimes requires a judgment

20   call.

21        **C.    GDSM**

22        90.  A central dispute at trial was whether the TAG auditors

23   used an overly restrictive definition of the term "GDSM," a

24   commodity rate category frequently used by MOL's own personnel for

25   shipments under the A08 and A09 Service Contracts.  According to

26   the damage figures presented in MOL's post-trial brief, shipments

27   incorrectly rated as GDSM account for over $10 million of the $15

28

**United States District Court**
For the Northern District of California

1   million in undercharges identified by TAG.[8]  MOL Br. Appx. H, I.

2   In other words, according to TAG, MOLIPS applied the GDSM rate to a

3   number of SeaMaster US and Summit US shipments when the tariff rate

4   or some other higher rate should have been applied.

5       91.  GDSM is not defined in the MOL tariff or the SeaMaster

6   Service Contracts.  See Exs. P-194 at 13, P-195 at 12.  Gaskins-

7   Kennedy testified that TAG used the definition of the term provided

8   by the U.S. Department of Transportation's Maritime Administration

9   ("MARAD"): "Abbreviation for general department store merchandise.

10  A classification of commodities that includes goods generally

11  shipped by mass merchandise companies."  Tr. at 727.  Thus,

12  according to Gaskins-Kennedy, the TAG auditors only considered the

13  GDSM rate applicable where the commodity being shipped could be

14  found in a "big-box store."  Tr. at 730.

15      92.  Defendants' expert on transportation subjects, James

16  Edward Devine, testified that GDSM is not normally limited to items

17  sold in big-box stores.  Tr. at 1837.  Rather, according to Devine,

18  it is generally up to the parties to a service contract to define

19  the term, and when they do, they often define it very broadly to

20  include almost any type of cargo that can be safely stowed in a dry

21  container.  Tr. at 1838.  Some carriers use a long list of products

22  they consider GDSM, while others define the term as cargo of any

23  kind with a number of exceptions.  Id.

24      93.  In a 2009 service contract with another customer, MOL

25  defined GDSM as "cargo of any kind" with certain exceptions:

26

27

28  [8] Neither Gaskins-Kennedy nor any other witness testified about the
    total amount of undercharges that are allegedly due to misuse of
    the GDSM rating.

> General Department Store Merchandise (hereinafter GDSM) shall consist of all Cargo of any kind except the following: Reefer and dangerous/hazardous Cargo; Chemicals; Yachts; Sailing Boats; Pleasure Crafts; Barges; Tug Boats and Miniature Submarines; Cargo moving in special equipment or Tank Containers; Used Household Goods; Used Personal Effects, Vehicles, Aircraft; and Ad Valorem Cargo.

Ex. D-565.

94. Jerry Huang, who negotiated the service contracts on behalf of SeaMaster, credibly testified that his understanding was that "all types of commodities can fall under GDSM. If there were certain types of commodities that would be excluded, the carrier, such as MOL, would very clearly state that in the contract." Tr. at 1527. MOL did not present any evidence concerning what it intended GDSM to mean when it negotiated the SeaMaster Service Contracts. Further, David Prado, who negotiated the SeaMaster Service Contracts on behalf of MOL, testified that he could not recall any discussion that particular cargos were to be excluded from the SeaMaster Service Contracts and, instead, covered by MOL's general tariff. Tr. at 2026.

95. The SeaMaster Service Contracts also included a catch-all category of goods called Group A, which was defined as:

> Group-A (In Straight or Mixed Loads) consisting of all cargo of any kind excluding Refrigerated Cargo, Dangerous/Hazardous Cargo, Yachts/Sailing Boats/Pleasure Crafts, Cargo moving on/in Special Equipment or Tank Container, Shipper Owned Empty Containers, Used Household Goods/Personal Effects, Vehicles, Aircraft, Ad Valorem Cargo and the following cargo: Textiles/Garments/Wearing Apparels (except Textiles Piece Goods/Fabers/Fabrics and Yarns), Footwear and Footwear Components, Toys, Fashion Accessories, and Electrical and Electronic Goods (except Small Personal Care Products, Small Household/Kitchen Appliances,

41

Computers and Computer Peripherals) [hereafter"
Group-A (In Straight or Mixed Loads)"].

Exs. P-194 at 13; P-195 at 14, Ex. P-196 at 11.   The A08 and A09
Service contracts list substantially more rates, i.e., origin-
destination pairs, for GDSM shipments than for Group A shipments,
suggesting that the GDSM rate was used much more frequently during
the terms of those contracts.   See Exs. P-194, P-195.

96.   The term GDSM does not appear in the A10 Service
Contract.   The parties added to that contract a Group B rate,
which, like Group A, is defined as "consisting of all cargo" with a
number of excluded commodities.   Ex. D-563.   Devine credibly
testified that, in his opinion, Groups A and B were used in the A10
Service Contract where GDSM had been used in A08 and A09 contract.
Tr. at 1856; Ex. D-584 at 30-32.   His expert report explains that
the A09 Service Contract was amended 102 times, resulting in the
addition of thousands of new GDSM rates.   Ex. D-584 at 29.
Likewise, the A10 Service contract was amended 112 times, resulting
in the addition of thousands of new Group A and Group B rates.   Tr.
at 34.

### D.   Alleged False Descriptions of Cargo

97.   MOL argues that, even if the Court agrees that a broader
definition of GDSM should have been used in the TAG audit, MOL is
entitled to recover for instances where SeaMaster US or Summit US
"described the cargo differently on the MOL bill of lading than on
their own house bill of lading."   MOL Br. at 10.   Several examples
of this alleged practice were presented throughout trial.

98.   In one example, MOL's master bill of lading describes the
subject cargo as "GDSM (SPECIAL TRAILER SERVICE TIRES)," while the

42

**United States District Court**
For the Northern District of California

SeaMaster US house bill of lading describes the cargo as "SPECIAL
TRAILER SERVICE TIRES." Ex. P-24. MOL contends that SeaMaster US
falsely described the cargo as GDSM in order to obtain a lower
freight rate. However, MOLIPS was under no obligation to rate the
cargo as GDSM merely because SeaMaster US described it that way.
If MOLIPS staff believed that special trailer service tires were
excluded from GDSM, they could have rated the cargo accordingly.

99.   The next two examples are more striking, but still not
compelling. In one, the house bill of lading describes the cargo
as "LATEX EXAM TEXTURE POWDER FREE GLOVES," while the master bill
describes the cargo as "MEDICAL SUPPLIES." Ex. P-24. In the
other, the house bill describes the cargo as "NITRILE GLOVES EXAM
POWDER FREE BLUE," and the master bill describes the cargo as
"PLASTIC GOODS." Id. The problem with these two examples (as well
as the first example described above) is that it remains unclear
how SeaMaster US and Summit US described the cargo to MOL. As
previously discussed, MOL uses a customer's shipping instructions
to generate a master bill of lading and those shipping instructions
are not before the Court. It is entirely possible that SeaMaster
US's shipping instructions described certain cargo as "NITRILE
GLOVES EXAM POWDER FREE BLUE" and MOL opted to describe the cargo
as "PLASTIC GOODS" in its master bill of lading. Further, it is
unclear whether the differences in descriptions allowed SeaMaster
US or Summit US to obtain a lower freight rate.

100. In the most striking example offered by MOL, the house
bill of lading describes the cargo as "CAPACITATOR," "DISCONNECT,"
"CONNECTOR," and "TRANSFORMER," and the master bill describes the
cargo as "HOUSEHOULD GOODS." Again, it is unclear how SeaMaster US

described the cargo in its shipping instructions and whether SeaMaster US benefited from a lower freight rate as a result.

101. Even if SeaMaster US's shipping instruction did falsely describe the cargo in the last three examples described above, MOL's damages are unclear. Neither Gaskins-Kennedy nor any other witness testified as to what portion of MOL's damages were due to false or inconsistent descriptions of cargo, as opposed to other errors such as those allegedly involving the application of GDSM. MOL's counsel broke out those damages at closing argument, but MOL has not pointed to any evidence to support this figure. Thus, in order to determine which cargo was falsely described, the Court would need to review and analyze each line of the 19,114 row spreadsheet created by TAG.

## CONCLUSIONS OF LAW

### I.    THE TRUCKING CASE

The Trucking Case has two aspects: (1) the Shenzhen door arrangement and (2) the U.S. trucking diversions. As discussed in Section IV of the Findings of Fact, MOL has all but abandoned its allegations concerning the U.S. trucking diversions. There is no evidence that Defendants were engaged in the alleged diversions, and MOL declined to address the issue in its post-trial brief. See FF ¶¶ 75-77. Due to the lack of evidence presented by MOL, the Court need not review the legal standards for misrepresentation, RICO, and conspiracy to determine that MOL cannot recover for the alleged U.S. trucking diversions.

Accordingly, this section focuses on MOL's claims only as they relate to the Shenzhen door arrangement. Specifically, the Court

United States District Court
For the Northern District of California

44

United States District Court
For the Northern District of California

reviews MOL's claims for: (1) intentional and negligent
misrepresentation against SeaMaster US, Summit US, Kesco Container,
and Kesco Shipping; (2) "intentional misrepresentation -
conspiracy" against SeaMaster US, Summit US, Kesco Container, and
Kesco Shipping; and (3) RICO and RICO conspiracy against SeaMaster
US and Summit US under 18 U.S.C. § 1962(c)-(d).  In addition to
examining the elements of these claims, the Court also addresses
Defendants' affirmative defense of unclean hands, the statute of
limitations, and MOL's claims for successor liability.[9]

### A.   Intentional and Negligent Misrepresentation

Under California law, the elements of intentional
misrepresentation, also known as fraud, are: "(1) a
misrepresentation (false representation, concealment, or
nondisclosure); (2) knowledge of falsity (or scienter); (3) intent
to defraud, i.e., to induce reliance; (4) justifiable reliance; and
(5) resulting damage." Robinson Helicopter Co., Inc. v. Dana
Corp., 34 Cal. 4th 979, 990 (Cal. 2004).  The elements of negligent
misrepresentation are the same, except that they do not include
scienter or intent to defraud. Small v. Fritz Cos., Inc., 30 Cal.
4th 167, 173 (Cal. 2003).  Instead, the plaintiff must show that
the defendant made a misrepresentation "without any reasonable
ground for believing it to be true." Cont'l Airlines, Inc. v.

---

[9] SeaMaster US and Summit US have asserted counterclaims for
negligent misrepresentation, intentional misrepresentation,
indemnity/contribution, and recoupment.  '61 Case ECF No. 76.  The
Court finds that these counterclaims have been abandoned as they
were not raised at trial or in the parties' briefing.  In any
event, for the reasons set forth in Section I.A of the Conclusions
of Law, SeaMaster US and Summit US cannot recover on these
counterclaims.

**United States District Court**
For the Northern District of California

1  McDonnell Douglas Corp., 216 Cal. App. 3d 388, 402 (Cal. Ct. App.

2  1989).

3       For the reasons set forth below, the Court finds that MOL has

4  proven each element of intentional and negligent misrepresentation

5  with respect to three of the four Defendants: SeaMaster US, Summit

6  US, and Kesco Container.

### 1.   Misrepresentation and scienter

8       There does not appear to be any dispute that Jerry Huang,

9  Raymond Cheng, Winnie Lau, and Geoffrey Tice knowingly arranged for

10  misrepresentations concerning thousands of Shenzhen door shipments.

11  In any event, the evidence on this point is clear.  At trial,

12  Huang, Cheng, Lau, and Tice testified that, as part of the Shenzhen

13  door arrangement, Defendants Kesco Container, SeaMaster US, and

14  Summit US represented that shipments originated from Shenzhen door

15  or other points in inland China when those shipments actually

16  originated from ports in and around Hong Kong.  See FF ¶¶ 38-41, 44

17  supra.  Huang, Cheng, Lau, and Tice also admitted that they

18  requested that MOL arrange for Rainbow to truck shipments between

19  Shenzhen door and the port, even though they knew that Rainbow

20  would not perform any trucking.  See id.  In other words, Huang,

21  Cheng, Lau, and Tice admitted that they made misrepresentations and

22  that they were aware that those misrepresentations were false.

23       As agents, Huang, Cheng, Lau, and Tice's actions and knowledge

24  can be imputed to Defendants Kesco Container, Summit US, and

25  SeaMaster US.  See Black v. Bank of Am., 30 Cal. App. 4th 1, 6

26  (Cal. Ct. App. 1994) ("A corporation is . . . a legal fiction that

27  cannot act at all except through its employees and agents.").

28  Huang agreed to the Shenzhen door arrangement in early 2009 and

United States District Court
For the Northern District of California

oversaw the arrangement through June 2010.  FF ¶¶ 55, 57, 59 supra.
During this time he was the managing director of SeaMaster HK and
on the board of directors of Defendant SeaMaster US.  Id. ¶¶ 27,
30.  While SeaMaster HK is not named as a defendant, it was the
local handling agent for Defendant SeaMaster US.  Id. ¶ 30.
Further, in practice, Huang essentially ran the operations of
SeaMaster US, which only had two low-level employees.  Id.  It is
unclear how many other persons at SeaMaster US were aware of the
arrangement.  Robert O'Neil and Robert Agresti, who held senior
positions at Summit US and SeaMaster US's parent, denied any
knowledge.  Id. ¶ 58.  In any event, SeaMaster US ratified Huang's
actions by booking thousands of false shipments through Shenzhen
door during the course of the arrangement.  See id. ¶ 63.

Similar reasoning applies to Cheng, who agreed to and managed
the Shenzhen door arrangement starting in 2000.  Id. ¶ 38.  Cheng
was the head of Kesco Container HK, and while that organization is
not a defendant in this matter, it acted as the local handling
agent for Defendants Kesco Container and Summit US.  Id. ¶ 16.
Further, Cheng acted as Kesco Container's agent by, for example,
negotiating MOL service contracts.  Id.  Cheng also consulted for
Summit SCM, a joint venture between Summit US and a company owned
by the Kesco partners, which also booked false Shenzhen door
shipments.  Id. ¶¶ 33, 51.  Tice and Lau worked under Cheng.  Id. ¶
44.  Both were aware of and helped manage the Shenzhen door
arrangement.  Id.  Tice worked directly for Kesco Container and the
Summit Group and negotiated MOL service contracts and Shenzhen door
rates on their behalf.  Id. ¶¶ 19, 46-47.  At Cheng's direction,
Lau booked false Shenzhen door shipments at Kesco Container HK and

**United States District Court**
For the Northern District of California

1    later at Summit SCM, where she ran day-to-day operations.  Id. ¶¶

2    44, 51.  Further, due to the efforts of Cheng, Lau, and Tice, Kesco

3    Container HK booked Shenzhen door shipments under Summit US's

4    service contracts with MOL.  Id. ¶¶ 49, 52.

5         Kesco Container and Kesco Shipping argue that they are not

6    proper parties to this suit because there is no evidence that they

7    induced MOL to pay trucking charges to Rainbow.  Kesco Br. at 18-

8    19.  But they fail to address the agency relationship between

9    Defendant Kesco Container and Cheng, Lau, Tice, and Kesco Container

10   HK, as well as the fact that Kesco Container ratified its agents'

11   actions by booking false Shenzhen door shipments.  However, this

12   argument does have merit with respect to Kesco Shipping, which MOL

13   almost entirely ignored throughout trial.  Kesco Shipping dealt

14   primarily with air freight and had no service contracts with MOL.

15   FF ¶ 14 supra.  Further, it is unclear from the evidence adduced at

16   trial whether Kesco Shipping had any relationship whatsoever with

17   Cheng, Lau, or Tice.  As MOL points out, Kesco Shipping was owned

18   by Edmond Fong, Kevin Chang, and Simon Chan, the same partners who

19   owned Kesco Container and Kesco Container HK.  Id. ¶ 15.  However,

20   Fong, Chang, and Chan have denied any knowledge of the Shenzhen

21   door arrangement, id. ¶ 41, and the Court is aware of no legal

22   authority that would allow it to impose liability on one defendant

23   merely because it was owned by the same individuals as another.

24        Accordingly, the Court finds that the misrepresentations and

25   scienter of Huang, Cheng, Lau, and Tice can be imputed to

26   Defendants Kesco Container, SeaMaster US, and Summit US, but not

27   Defendant Kesco Shipping.

28   ///

United States District Court
For the Northern District of California

1

## 2. Intent to induce reliance

2      "One who makes a fraudulent misrepresentation is subject to

3 liability to the persons . . . whom he intends or has reason to

4 expect to act . . . in reliance upon the misrepresentation."

5 Lovejoy v. AT&T Corp., 92 Cal. App. 4th 85, 93 (Cal. Ct. App. 2001)

6 (quoting Restatement (Second) of Torts § 525). "Since direct proof

7 of fraudulent intent is often impossible, the intent may be

8 established by inference from acts of the parties." Santoro v.

9 Carbone, 22 Cal. App. 3d 721, 727 (Cal. Ct. App. 1972). Fraudulent

10 intent is a necessary element of MOL's claim for intentional

11 misrepresentation. See id. But to prove negligent

12 misrepresentation, MOL need only show that Defendants made

13 misrepresentations without any reasonable grounds for believing

14 them to be true. Cont'l Airlines, 216 Cal. App. 3d at 402. The

15 Court finds both elements are satisfied here.

16      Defendants contend that they had no reason to expect that MOL

17 would be misled by their representations concerning Shenzhen door

18 shipments because those representations were made at the behest of

19 Yip, the head of MOL HK. See SM Br. at 36. Defendants are

20 essentially arguing that there was no fraudulent intent because

21 they believed that the Shenzhen door arrangement was legitimate due

22 to Yip's position. Defendants frame the issue as one of apparent

23 authority. See Kesco Br. at 13; SM Br. at 38-39.

24      It is well established that when an agent such as Yip is

25 placed in charge of a business, "he is clothed with apparent

26 authority to do all things that are essential to the ordinary

27 conduct of such business," and third parties, such as Defendants,

28 "acting in good faith and without notice of or reason to suspect

49

**United States District Court**
For the Northern District of California

any limitations on his authority, are entitled to rely on such appearance." <u>Henry Cowell Lime & Cement Co. v. Santa Cruz Cnty. Nat'l Bank</u>, 82 Cal. App. 519, 524 (Cal. Ct. App. 1927).  Thus, when an agent proposes a transaction that appears regular on its face and the agent appears to be acting within the ordinary course of business, the principal may be charged with liability for the fraud.  <u>See</u> <u>Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.</u>, 456 U.S. 556, 566 (1982).

The problem with Defendants' position is that they had strong reasons to suspect the legitimacy of the Shenzhen door arrangement and to question whether Yip was acting within the scope of his authority when he proposed it.  After all, the arrangement required Defendants to (1) declare false points of origin, (2) make payments for non-existent truck moves, and (3) trust that they would be reimbursed for these payments by kickbacks from Rainbow.  <u>See</u> FF ¶¶ 40, 55 <u>supra</u>.  The entire arrangement was clearly designed to divert money from MOL to Rainbow and to avoid detection by the rest of MOL.  Indeed, Huang testified that he suspected that Yip had an interest in Rainbow and that MOL would lose money on each truck move made by Rainbow.  <u>Id.</u> ¶ 57.  Huang also knew that the arrangement proposed by Yip was at odds with the deal proposed by others at MOL.  <u>Id.</u> ¶ 56.  David Prado, SeaMaster's main contact at MOL, had offered to block more space on MOL's vessels for SeaMaster cargo in exchange for higher fees.  <u>Id.</u> ¶ 54.  In stark contrast, Yip offered to block more space and to provide SeaMaster lower rates than it was already paying, and, in exchange, he asked only that SeaMaster misrepresent the origin of its cargo.  <u>Id.</u> ¶ 55. ///

United States District Court
For the Northern District of California

Despite these glaring red flags, there is no indication that anyone from Defendants ever discussed the arrangement with anyone from MOL other than Yip.[10]  See FF ¶ 43, 47, 57, 66-67 supra. Further, while Huang, Cheng, Tice, and Lau claim they believed that the arrangement was legitimate, the Defendants' principals -- Robert O'Neil, Robert Agresti, Fong, Chang, and Chan -- all testified that they were completely unaware of the arrangement until the inception of this litigation.  Id. ¶¶ 41, 58.  It is simply implausible that Huang, Cheng, Tice, and Lau believed that MOL was aware of the Shenzhen door arrangement when they went to such great lengths to keep it secret.

The actions of Defendants' agents from 2000 through 2010 confirm that they were aware of MOL's ignorance.  Defendants never requested to enter a written contract documenting the Shenzhen door arrangement, despite the fact that there was no guarantee that Rainbow would reimburse them for their additional payments to MOL for non-existent trucking.  FF ¶¶ 43, 71 supra.  Tice repeatedly negotiated with MOL to reduce the Shenzhen trucking rates without mentioning that no trucking would actually take place.  Id. ¶¶ 46-47.  Defendants received thousands of bills of lading from MOL listing incorrect places of receipt, but they never alerted MOL to the inconsistency.  Id. ¶ 45, 71.  Throughout the arrangment, Huang and others were careful not to communicate their discussions with Yip to others at MOL (with the exception of Yang).  See id. ¶ 67. Defendants only ceased booking Shenzhen door shipments when MOL significantly increased its rates for inland trucking.  Despite the

---

[10] As Defendants point out, Huang also spoke with Rebecca Yang at MOL about the arrangement, but Yang was later fired for passing on confidential information to customers.  FF ¶¶ 54, 57 supra.

**United States District Court**
For the Northern District of California

1  fact that this increase rendered the Shenzhen door arrangement
2  infeasible, Defendants never raised this issue with anyone at MOL
3  except Yip.  Id. ¶¶ 66-68.

4      Defendants argue that MOL confirmed Yip's apparent authority
5  by sending Huang the Inland Trucking Agreement, Ex. D-535, because
6  that agreement formalized the arrangement and was signed by Yip on
7  behalf of MOL.  SM Br. at 38-39.  This argument is not persuasive.
8  The Inland Trucking Agreement, which ostensibly set forth the rates
9  that MOL would charge for Shenzhen trucking, was an attempt to
10 cover up the Shenzhen door arrangement, not formalize it.  The
11 agreement does not mention that no trucking would actually occur or
12 that Rainbow would reimburse Defendants for all trucking payments
13 made to MOL.  FF ¶ 61 supra.  Indeed, Huang admitted that he never
14 read the agreement because he knew that SeaMaster would be
15 reimbursed by Rainbow.  Id. ¶ 62.  Contrary to Defendants'
16 argument, the Inland Trucking Agreement undermined Yip's apparent
17 authority.

18     Accordingly, the Court finds that MOL has established
19 Defendants SeaMaster US, Summit US, and Kesco Container's intent to
20 induce reliance.  Therefore, these Defendants also had no
21 reasonable grounds to believe that the Shenzhen door arrangement
22 was legitimate.

23          **3.  Justifiable reliance**
24     Defendants contend that MOL could not have justifiably relied
25 on any misrepresentations made in connection with the Shenzhen door
26 arrangement because (1) Yip's knowledge of the arrangement must be
27 imputed to MOL and (2) MOL must have had actual knowledge of the

28

**United States District Court**
For the Northern District of California

1  arrangement.  SM Br. at 37.  The Court finds both arguments

2  unavailing.

3              i.   Imputed knowledge

4       With respect to the first argument, "[a] principal is

5  chargeable with and is bound by the knowledge of, or notice to, his

6  agent received while the agent is acting within the scope of his

7  authority and which is with reference to a matter over which his

8  authority extends."  Columbia Pictures Corp. v. DeToth, 87 Cal.

9  App. 2d 620, 630 (Cal. Ct. App. 1948).  This is the case regardless

10 of whether the agent's knowledge is actually communicated to the

11 principal.  Id.

12      The reason for this rule is that "an innocent third party may

13 properly presume the agent will perform his duty and report all

14 facts which affect the principal's interest."  Sands v. Eagle Oil &

15 Ref. Co., 83 Cal. App. 2d 312, 319 (Cal. Ct. App. 1948).  "The rule

16 is intended to protect those who exercise good faith, and not as a

17 shield for unfair dealings."  Id. (quotations omitted).  Thus,

18 California courts have enunciated at least three exceptions to the

19 general rule of imputation: (1) where an agent and a third party

20 act in collusion against the principal, (2) where the third party

21 knows or has reason to know that the agent will not advise the

22 principal, and (3) where the agent's action is adverse to the

23 principal.  River Colony Estates Gen. P'ship v. Bayview Fin.

24 Trading Group, Inc., 287 F. Supp. 2d 1213, 1227 (S.D. Cal. 2003)

25 (citing Sands, 83 Cal. App. 2d at 319-20; Meyer v. Glenmoor Homes,

26 Inc., 245 Cal. App. 2d 242, 264 (Cal. Ct. App. 1966)).

27      In this case, all three exceptions apply for substantially

28 similar reasons.  The Shenzhen door arrangement amounts to

53

**United States District Court**
For the Northern District of California

collusion between Yip and Defendants to defraud MOL, Yip's
principal.  While the Shenzhen door arrangement may have been Yip's
idea, he needed a partner to carry it out.  To induce MOL to make
payments to Rainbow, Yip needed persons outside MOL who could book
shipments with a false place of origin and request trucking
services that they did not actually need.  Yip found Huang and
Cheng to fill that role.  Because MOL's ignorance was a necessary
part of the arrangement -- MOL had to believe that Rainbow was
actually performing trucking so that it would pay Rainbow for that
trucking -- Huang and Cheng could trust that Yip would not
communicate his knowledge of the arrangement to others at MOL.

Defendants ignore the first two exceptions and concentrate on
the third, the so-called "adverse interest exception."  Citing
mainly New York law, they argue that the Court must impute Yip's
knowledge to MOL unless the adverse interest exception is
applicable and that the adverse interest exception only applies
where an agent has "totally abandoned" the principal's interests.
SM Br. at 37 (citing Bank of China v. NBM LLC, 359 F.3d 171 (2d
Cir. 2003); Allard v. Arthur Andersen & Co., 924 F. Supp. 488
(S.D.N.Y. 1996); Center v. Hampton Affiliates, Inc., 66 N.Y.2d 782
(N.Y. 1985)); Kesco Br. at 12-13 (citing same).  "[U]nder New York
law, the adverse interest exception does not apply when the agent
acts both for himself and the principal, though his primary
interest is inimical to the principal."  Allard, 924 F. Supp. at
495 (quotations omitted).  New York courts have further stated that
the adverse interest exception cannot be invoked "merely because
[the agent] has a conflict of interest or because he is not acting
primarily for his principal."  Center, 66 N.Y.2d at 785.  Setting

aside the fact that the adverse interest exception is not the only exception to the imputation rule under California law, Defendants' cases are inapposite.

In <u>Bank of China</u>, the defendants allegedly borrowed huge sums from the plaintiff bank based on false and misleading representations and forged documents.  359 F.3d at 174.  The success of the fraud was partially dependent on bribes paid to the deputy manager of the bank, who was also a defendant.  <u>Id.</u> at 175.  The Second Circuit vacated the jury award for the plaintiff because the district court refused to give an adverse interest instruction.  <u>Id.</u> at 178-79.  The court did not reach the issue of whether the deputy manager had totally abandoned his interest to the plaintiff.

In <u>Allard</u>, the bankruptcy trustee of DeLorean Motor Company ("DMC") brought a securities fraud action against DMC's former auditors for failing to detect wrongdoing by the former head of DMC, John Z. DeLorean ("DeLorean").  924 F. Supp. at 490-91.  DeLorean had allegedly caused a number of DMC subsidiaries to enter into sham contracts so that DeLorean could siphon money away from the subsidiaries and into his own personal accounts.[11]  <u>DED</u>, 924 F. Supp. at 455.  Allegedly, DeLorean misappropriated half of the proceeds and used the other half to bribe executives at Lotus "with an eye to the future purchase of Lotus for his own account."  <u>Allard</u>, 924 F. Supp. at 495.  The auditors moved for summary judgment, arguing that the intentional misconduct of DeLorean, should be imputed to the trustee.  <u>Id.</u> at 494.  The court

---

[11] The <u>Allard</u> court recited most of the relevant facts of the case in <u>Dep't of Econ. Dev. v. Arthur Andersen & Co. ("DED")</u>, 924 F. Supp. 449 (S.D.N.Y. 1996), a concurrent opinion rendered in a related case.

**United States District Court**
For the Northern District of California

1    ultimately denied summary judgment, but noted that "[a]t trial, it
2    will not be easy for the Trustee to prove that no portion of the
3    [sham] contract proceeds inured to the benefit of DMC."  Id.
4    Unlike here, there is no indication that the agent and third party
5    in Allard actually colluded.  Further, the Allard court never
6    reached the issue of whether Delorean had totally abandoned the
7    interest of his principal.  In fact, the Allard court noted that,
8    if the trustee's allegations were true, then "it could be said that
9    DeLorean totally abandoned the interest of DMC with the result that
10   his conduct would not be imputed to DMC under . . . New York law."
11   Id.

12        Center also does not help Defendants.  In that case, a
13   shareholder agreed to transfer his shares of stock to the
14   plaintiff.  Center, 66 N.Y.2d at 783-4.  The shareholder later
15   died, and his estate transferred his shares to the defendants.  Id.
16   at 784.  The plaintiff conceded that defendants had no notice of
17   his rights, but contended that their agent, an attorney and
18   director of the corporation, did.  Id.  At summary judgment, the
19   court rejected the defendants' invocation of the adverse interest
20   exception because their "moving papers contain[ed] only conclusory
21   allegations that [the agent] was seriously conflicted throughout
22   these transactions and that he and [the deceased shareholder] tried
23   to defraud the corporation."  Id. at 785.  In the instant matter,
24   however, MOL has presented credible evidence that Yip was using
25   Defendants to siphon money to Rainbow.  See FF ¶¶ 38-39 supra.

26        Defendants contend that if MOL received any benefit from Yip's
27   actions, then the Court must impute Yip's knowledge to MOL.  SM Br.
28   at 39-40; Kesco Br. at 13.  They further argue that Yip's action

**United States District Court**
For the Northern District of California

allowed MOL to secure Defendants' business and, in any event, because MOL failed to produce evidence of its profits at trial, the Court must infer that MOL profited from the scheme.  Id.  This line of argument is belied by the testimony of Huang and Cheng, who admitted that they entered into the arrangement because they were having difficulty securing space for Defendants' cargo on MOL's ships.  See FF ¶¶ 37-38, 53-55 supra.  Thus, if Defendants had taken their business elsewhere, MOL could have found other customers to take their place.  Further, Huang and Cheng could have legitimately obtained space protection by paying a premium to MOL.  See id. ¶ 54.  Instead, they opted to strike an under-the-table deal with Yip to obtain free space protection in exchange for misrepresenting the origin of their cargo.  Id. ¶¶ 38, 55.  Thus, the Shenzhen door arrangement caused MOL to give away a valuable service -- space protection -- for free.  It also allowed Defendants to avoid paying the higher origin receiving charges that MOL assessed at Hong Kong ports.  Id. ¶¶ 40, 55.

In any event, it is not altogether clear that Defendants would have taken their business elsewhere had it not been for Yip's proposal.  Kesco Container's biggest client, Jones Apparel, had insisted on using MOL's services.  Id. ¶ 20.  Further, Kesco Container and SeaMaster US agreed to service contracts with MOL with minimum quantity commitments before Yip proposed the arrangement, and many of Defendants' principals, including O'Neil, Agresti, Chan, Fong, and Chang -- who presumably had some say about their companies' choice of ocean carrier -- claim that they were unaware of the arrangement.  See id. ¶¶ 37, 41, 53, 58.
///

**United States District Court**
For the Northern District of California

1    Even if MOL had received some incidental benefit from the

2  Shenzhen door arrangement, Defendants' own authority suggests such

3  an incidental benefit is insufficient to trigger imputation.

4  Center frames the adverse interest exception as an issue of motive:

5  "To come within the exception, the agent must have totally

6  abandoned his principal's interests and be acting entirely for his

7  own or another's purposes."  66 N.Y.2d at 784-85.  Allard does the

8  same: "the adverse interest exception is not triggered if the agent

9  is acting at least in part to further the principal's interest."

10  924 F. Supp. at 495 (citing Matthew G. Dore, Presumed Innocent?

11  Financial Institutions, Professional Malpractice Claims, and

12  Defenses Based on Management Misconduct, 1995 Colum. Bus. L. Rev.

13  127, 161 (1995) ("The courts appear to agree that adverse interest

14  should be determined by a corporate agent's motives, rather than

15  the outcome of his activities, and that if the agent acts for the

16  benefit of the corporation at least in part, the adverse interest

17  exception does not apply.")).  While Yip did not testify at trial,

18  the Court can infer a motive from his actions.  Yip orchestrated

19  and managed an arrangement that provided MOL's customers with

20  unauthorized discounts and services and induced MOL to pay Rainbow

21  for non-existent truck moves.  These facts strongly suggest that

22  Yip totally abandoned MOL's interests.

23              ii.  Actual knowledge

24    Defendants also argue that MOL must have been aware of the

25  arrangement.  First, they point to the fact that the arrangement

26  lasted ten years and implicated thousands of shipments passing

27  through multiple cities and ports.  Kesco Br. at 14.  Second, they

28  contend that MOL should have known that it was losing money on

58

**United States District Court**
For the Northern District of California

Shenzhen door moves.  SM Br. at 41.  Third, they argue that MOL's

customer service department must have been aware of the arrangement

because, in breaking with its normal practice, it did not send out

a written notice to the cargo supplier to arrange for trucking for

Shenzhen door moves handled by Rainbow.  Kesco Br. at 14.  Fourth,

they contend that the Court should draw an adverse inference

against MOL since it did not offer any evidence concerning who else

at MOL was aware of the arrangement and refused to disclose the

findings of its internal investigation into the arrangement on the

grounds of attorney-client privilege.  SM Br. at 41.

     In light of the other evidence presented at trial, these

arguments are not persuasive.  As an initial matter, it does not

matter whether MOL personnel other than Yip were aware of the

arrangement.  If other personnel were aware of the arrangement and

either participated in it or failed to disclose it, then they were

colluding against MOL or acting adversely to MOL's interests and

their knowledge could not be imputed to MOL.  Further, Defendants'

arguments ignore the fact that the arrangement was clearly designed

to avoid detection by MOL.

     As noted in the Findings of Fact, MOL potentially could have

discovered the Shenzhen door arrangement earlier had it conducted a

reasonable investigation into Rainbow.  FF ¶¶ 73-74 <u>supra</u>.

However, this finding does not bar MOL's right to recovery

altogether.  Under California law, it is well established that "one

to whom a representation is made has no duty to employ means of

knowledge which are open to that party and which could, if pursued,

reveal the falsity of that representation." <u>Linden Partners v.</u>

<u>Wilshire Linden Assocs.</u>, 62 Cal. App. 4th 508, 529 (Cal. Ct. App.

**United States District Court**
For the Northern District of California

1    1998) (citing <u>Ruhl v. Mott</u>, 120 Cal. 668, 676 (1898)).  Here,

2    Defendants repeatedly misrepresented the origin of their cargo to

3    MOL and went to great lengths to conceal those misrepresentations,

4    including paying for trucking that never took place.  <u>See, e.g.</u>, FF

5    ¶ 38 <u>supra</u>.  MOL did not investigate these representations until

6    March 2011, long after the Shenzhen door arrangement had concluded.

7    <u>Id.</u> ¶ 69.

8         For these reasons, and the reasons set forth in Section

9    I.A.3.i <u>supra</u>, the Court finds that MOL did not have actual or

10   imputed knowledge of the Shenzhen door arrangement.  The Court also

11   finds that MOL's reliance on Defendants' misrepresentations was

12   justifiable.

13              **4.   Damages**

14        As to the final element of intentional and negligent

15   misrepresentation, the Court finds that MOL was damaged by the

16   misrepresentations of Defendants SeaMaster US, Summit US, Kesco

17   Container and their agents.  As a result of these

18   misrepresentations, MOL made payments to Rainbow for trucking that

19   never took place, and these payments were higher than the trucking

20   arbitrary paid to MOL by Defendants.  <u>See, e.g.</u>, FF ¶ 39 <u>supra</u>.

21   Further, Defendants' misrepresentations allowed them to avoid the

22   higher origin receiving charges assessed by MOL at the Hong Kong

23   ports.  <u>Id.</u> ¶ 40.  Finally, MOL was damaged because, as part of the

24   Shenzhen door arrangement, Yip gave Defendants free space

25   protection, a service for which MOL generally charges a premium.

26   <u>See id.</u> ¶¶ 38, 54.  The parties dispute the exact amount of MOL's

27   damages.  The Court addresses these disputes in Section III, below.

28   ///

**B.   Conspiracy**

MOL also asserts a claim for conspiracy to commit intentional misrepresentation against all four defendants.  Conspiracy is not an independent cause of action, but "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  Davenport v. Litton Loan Servicing, LP, 725 F. Supp. 2d 862, 881 (N.D. Cal. 2010) (quotations omitted). "Liability for civil conspiracy generally requires three elements: (1) formation of a conspiracy (an agreement to commit wrongful acts); (2) operation of a conspiracy (commission of the wrongful acts); and (3) damage resulting from operation of a conspiracy." Id.

Under California law, co-conspirators may be found jointly and severally liable for damages.  See Kesmodel v. Rand, 119 Cal. App. 4th 1128, 1143-44 (Cal. Ct. App. 2004) (citing Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503 (Cal. 1994)).  Co-conspirators are generally liable for the acts of all other conspirators undertaken in furtherance of the conspiracy both prior and subsequent to the co-conspirators joining the conspiracy. Pinkerton v. United States, 328 U.S. 640, 646-47 (1946).  Co-conspirators are not necessary parties.  In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 284 (4th Cir. 2007).

In this case, there were at least two conspiracies.  The first conspiracy began in 2000, when Cheng, on behalf of Kesco Container, agreed to enter into the Shenzhen door arrangement with Yip.  See FF ¶¶ 37-38 supra.  Before the conspiracy concluded in June 2010, it was joined by Summit US.  In 2006, Tice, a high-level employee

61

**United States District Court**
For the Northern District of California

1   at Summit US's predecessor, agreed to the arrangement and worked

2   with Cheng and Lau at Kesco to carry it out.  See id. ¶¶ 44, 46.

3   Defendants argue that Summit US cannot be held liable for the acts

4   of its predecessor.  Even if that is the case, Summit US was

5   directly involved with the conspiracy in 2009 through its joint

6   venture with the Kesco partners, Summit SCM.  See id. ¶ 51.  At

7   Summit SCM, the Shenzhen door arrangement was managed by Winnie

8   Lau, a former Kesco Container HK employee who ran Summit SCM's day-

9   to-day operations.  Id.  Lau continued to report to Cheng about the

10  arrangement after she transitioned to Summit SCM.  Id.  Thus, there

11  was an agreement to carry out the arrangement between Cheng, at

12  Kesco Container, and Lau, at Summit US.  The two worked together to

13  operate the conspiracy and MOL suffered damages as a result.  As

14  such, Kesco Container and Summit US can be held jointly and

15  severally liable for the entire conspiracy, including acts

16  committed in furtherance of the conspiracy prior to Summit US's

17  incorporation.

18      The second conspiracy started in 2009, when Huang, on behalf

19  of SeaMaster US, agreed to the Shenzhen door arrangement with Yip.

20  FF ¶ 55 supra.  The fact that Yip is not a named defendant does not

21  defeat MOL's conspiracy claim.  In re Cotton Yarn, 505 F.3d at 284.

22  However, it does limit its impact since, as a non-party, Yip cannot

23  be held jointly and severally liable for MOL's damages.  MOL has

24  also suggested that SeaMaster was a part of the conspiracy between

25  Yip, Kesco Container, and Summit US.  However, it has failed to

26  present credible evidence on this issue.  There is no indication

27  that Huang or anyone else at SeaMaster US spoke with anyone at

28  Kesco Container or Summit US about the arrangement.  In fact, it

**United States District Court**
For the Northern District of California

1  appears that Huang was completely ignorant of the Kesco-Summit-Yip

2  conspiracy.  See FF ¶ 48 supra.  As such, SeaMaster cannot be held

3  jointly and severally liable for shipments moving under the Kesco-

4  Summit-Yip conspiracy.

5      For these reasons, the Court finds against Kesco Container,

6  Summit US, and SeaMaster US on MOL's claim for conspiracy to commit

7  intentional misrepresentation.  The Court also finds that Summit US

8  and Kesco Container may be held jointly and severally liable for

9  all acts committed in furtherance of the conspiracy between 2000

10  and June 2010.

11     **C.   RICO**

12     To recover for a civil RICO violation, a plaintiff must prove

13  "(1) conduct (2) of an enterprise (3) through a pattern (4) of

14  racketeering activity."  Odom v. Microsoft Corp., 486 F.3d 541, 547

15  (9th Cir. 2007) (quotations omitted).  Defendants argue that MOL

16  cannot recover under RICO because the statute only applies to

17  domestic enterprises, not foreign ones.  SM Br. at 47.  The Court

18  previously addressed this issue at the pleading stage when it

19  denied Defendants' motion to dismiss MOL's second amended

20  complaint.  Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc.,

21  871 F. Supp. 2d 933 (N.D. Cal. 2012).

22     In its previous order, the Court found that RICO has no

23  extraterritorial application and applies only to domestic

24  enterprises.  Id. at 940.  The Court then adopted the so-called

25  "nerve center test" to determine the territoriality of the alleged

26  enterprise.  Id.  The nerve center test "[f]ocus[es] on the brains

27  rather than the brawns of the enterprise" and "examines the

28  "decisions effectuating the relationships and common interest of

63

**United States District Court**
For the Northern District of California

1  [the enterprise's] members, and how those decisions are made." Id.

2  at 942 (quotations omitted).  Based on the pleadings, the Court

3  determined that the nerve center of the alleged enterprise was in

4  the United States.  Id. at 942-43.

5      The facts adduced at trial tell a different story.  They show

6  that the Shenzhen door arrangement was set up in Hong Kong by Yip,

7  Cheng, and Huang.  FF ¶¶ 16, 27, 38, 55 supra.  All three of these

8  individuals worked in Hong Kong and directed the arrangement from

9  Hong Kong.  See id.  The Shenzhen door shipments were booked in

10 Hong Kong.  See id. ¶¶ 44, 51, 59, 63.  Rainbow, the key to the

11 entire arrangement, was located in Hong Kong.  Id. ¶ 38.  MOL

12 points to Tice's involvement as evidence that the nerve center of

13 the arrangement was in the United States.  MOL Br. at 14 n.11.

14 While Tice worked in the United States and took an active role in

15 negotiating Kesco's Shenzhen door rates, he was far from the nerve

16 center of the arrangement.  Rather, the evidence suggests that he

17 took orders from Cheng in Hong Kong.  See FF ¶ 44, 47 supra.  MOL

18 also argues that the RICO enterprise was domestic because Summit

19 US, SeaMaster US, and Kesco Container are based out of the United

20 States.  But the evidence shows that their Hong Kong offices or

21 agents ran the arrangement and that the U.S. offices had very

22 little involvement.  See id. ¶¶ 44, 45, 59.

23     Accordingly, the Court finds for Defendants on MOL's claims

24 for civil RICO violations and DISMISSES those claims WITH

25 PREJUDICE.

26     **D.   Unclean Hands**

27     Based on Yip's involvement in the Shenzhen door arrangement,

28 Defendants assert an affirmative defense of unclean hands to MOL's

claims for intentional and negligent misrepresentation.  Unclean
hands is an equitable doctrine that "demands that a plaintiff act
fairly in the matter for which he seeks a remedy."  <u>Kendall-Jackson
Winery, Ltd. v. Super. Ct.</u>, 76 Cal. App. 4th 970, 978 (Cal. Ct.
App. 1999).  "The unclean hands doctrine closes the doors of a
court of equity to one tainted with inequitableness or bad faith
relative to the matter in which he seeks relief, however improper
may have been the behavior of the defendant."  <u>Adler v. Fed.
Republic of Nigeria</u>, 219 F.3d 869, 876-77 (9th Cir. 2000)
(quotations omitted).

Defendants argue that Yip's bad acts should be imputed to MOL
and, as such, it would be inequitable to allow MOL to recover.  SM
Br. at 42-23.  The imputation rules for unclean hands appear to be
identical to the rules applied as a matter of agency law.  <u>See
River Colony</u>, 287 F. Supp. 2d at 1227-28.  The Court has already
reviewed these principles above in the context of whether Yip's
knowledge of the Shenzhen door arrangement can be imputed to MOL
for the purposes of assessing MOL's reliance on Defendants'
misrepresentations.  <u>See</u> Conclusions of Law ("CL") § I.A.3.i <u>supra</u>.
For the reasons set forth in that discussion, the Court finds that
Yip's bad acts cannot be imputed to MOL.

Defendants also argue that it would be inequitable to impute
the bad acts of their agents, Huang, Cheng, Lau, and Tice, while at
the same time refusing to impute Yip's bad acts to MOL.  The Court
finds that the imputation rules differ because Defendants' agents
were not acting adversely to Defendants' interests.  <u>See River
Colony</u>, 287 F. Supp. 2d at 1227.  Both Huang and Cheng admitted
that they agreed to the Shenzhen door arrangement because it was

**United States District Court**
For the Northern District of California

1  profitable for Defendants: The arrangement allowed them to obtain

2  free space protection and avoid higher origin receiving charges.

3  <u>See</u> FF ¶¶ 38, 43, 57 <u>supra</u>.    While the arrangement did require

4  Defendants to overpay for non-existent trucking, Huang and Cheng

5  expected that those overpayments would be fully reimbursed by

6  Rainbow.  <u>See id.</u> ¶¶ 39, 62.  Thus, neither the adverse interest

7  exception nor the other exceptions enunciated by California courts

8  apply to Huang or Cheng.  <u>See River Colony</u>, 287 F. Supp. 2d at

9  1227.  Huang and Cheng were not colluding with Yip or MOL against

10  Defendants, and there was no reason for Yip to believe that Huang

11  or Cheng would keep their knowledge about the arrangement from

12  their principals.  In fact, in 2000, Cheng did discuss the

13  arrangement with his superior, Paul Chan, who was then director of

14  Kesco Container HK.  FF ¶ 41 <u>supra</u>.

15      Accordingly, the Court finds that the doctrine of unclean

16  hands does not bar MOL from recovering for its claims for

17  intentional and negligent misrepresentation.

18      **E.   <u>Statute of Limitations</u>**

19      As the Court has dismissed MOL's RICO claims, it only

20  addresses the statute of limitations for MOL's claims for

21  intentional misrepresentation, negligent misrepresentation, and

22  conspiracy.  Under California law, the statute of limitations for

23  claims based on fraud or mistake is three years.  Cal Code Civ.

24  Proc. § 338(d).

25      There are three relevant exceptions to the three-year statute

26  of limitations in cases such as this.  First, the continuing

27  accrual rule provides that a cause of action accrues each time a

28  wrongful act occurs, triggering a new limitations period.  <u>Aryeh v.</u>

**United States District Court**
For the Northern District of California

1   <u>Canon Bus. Solutions, Inc.</u>, 55 Cal. 4th 1185, 1199 (Cal. 2013).

2   Second, the discovery rule "postpones accrual of a cause of action

3   until the plaintiff discovers, or has reason to discover, the cause

4   of action, until, that is, he at least suspects, or has reason to

5   suspect, a factual basis for its elements." <u>Norgart v. Upjohn Co.</u>,

6   21 Cal. 4th 383, 389 (Cal. 1999).   Third, under the "last overt act

7   doctrine," where the plaintiff has proved the existence of a

8   conspiracy, "the statute of limitations does not begin to run until

9   the final act in furtherance of the conspiracy has been committed."

10  <u>People v. Beaumont Inv., Ltd.</u>, 111 Cal. App. 4th 102, 137 (Cal. Ct.

11  App. 2003).

12      Here, the Shenzhen door arrangement ran from sometime in 2000

13  through June 2010, and MOL filed the trucking case against

14  SeaMaster US and Summit US on June 10, 2011 and amended its

15  complaint to add Kesco Container and Kesco Shipping as Defendants

16  on February 24, 2012.   '61 Case ECF Nos. 1, 72.   Because MOL had

17  reason to investigate the arrangement earlier than it did, FF ¶¶

18  73-74 <u>supra</u>, the discovery rule does not affect the tolling of the

19  statute of limitations.   Thus, pursuant to the continuing accrual

20  rule, MOL would normally only be able to recover against Kesco

21  Container and SeaMaster US and Summit US for bad acts committed

22  after February 24, 2009 and June 10, 2008, respectively.   However,

23  because MOL has proved that Kesco Container, Summit US, and

24  SeaMaster US were engaged in a conspiracy, <u>see</u> CL § I.B <u>supra</u>, the

25  last overt act doctrine applies.   Thus, the statute of limitations

26  did not begin to run until the termination of the arrangement in

27  June 2010, the date of the last overt act committed in furtherance

28

1  of each conspiracy.  See Wyatt v. Union Mortgage Co., 24 Cal. 3d

2  773, 788 (Cal. 1979).

3      For these reasons, the Court finds that the statute of

4  limitations does not bar MOL from recovering against Kesco

5  Container, SeaMaster US, or Summit US.  Kesco Container and Summit

6  US are jointly and severally liable for all acts committed in

7  furtherance of their conspiracy with Yip between 2000 and 2010.

8  SeaMaster US is liable for all acts committed in furtherance of its

9  conspiracy with Yip between 2009 and 2010.

10     **F. Successor Liability**

11     MOL argues that SeaMaster US and Summit US are also liable as

12 successors for the acts of their predecessors.  MOL Br. at 21-25.

13 These claims are predicated on the bankruptcy of the Summit Group

14 and its subsidiaries in early 2008 and the subsequent incorporation

15 of SeaMaster US and Summit US.  See id.  MOL submits that its

16 second amended complaint in the trucking case, the operative

17 pleading in the matter, alleges sufficient facts to support a claim

18 for successor liability.  Id. at 22.  In the event that the Court

19 finds otherwise, MOL moves for leave to amend to conform its

20 pleading to the evidence adduced at trial.  '61 Case ECF No. 254.

21 SeaMaster US and Summit US have opposed MOL's claim for successor

22 liability on procedural and substantive grounds.  SM Br. at 44-45.

23     The Court finds that this issue is now moot.  Since the Court

24 finds that SeaMaster US did not enter into the Shenzhen door

25 arrangement until after the Summit Group bankruptcy, the actions of

26 its predecessor are irrelevant.  The successor liability of Summit

27 US is also irrelevant.  Because Summit US ultimately joined Kesco

28 Container's conspiracy with Yip, Summit US and Kesco Container are

United States District Court
For the Northern District of California

68

**United States District Court**
For the Northern District of California

1  jointly and severally liable for all acts committed in furtherance

2  of the conspiracy.  See CL § I.B supra.  Thus, regardless of

3  whether Summit US can be held liable for the acts of its

4  predecessor, it is liable for all of Kesco Container's Shenzhen

5  door shipments under principles of conspiracy law, including those

6  shipments booked before the incorporation of Summit US in 2008 and

7  the formation of the Summit Group in 2006.  See Kesmodel, 119 Cal.

8  App. 4th at 1143-44.

9

10  **II.   THE FREIGHT RE-RATING CASE**

11      In the freight re-rating case, MOL asserts claims for

12  violation of the Shipping Act, 46 U.S.C. §§ 40101 et seq., breach

13  of maritime contract, and accounting.[12]  MOL claims that it is

14  entitled to recover for undercharges assessed against SeaMaster US

15  and Summit US, regardless of whether those undercharges were solely

16  the result of mistakes by MOL staff, because the Shipping Act is a

17  strict liability statute.

18      MOL primarily relies on the "filed rate doctrine" enunciated

19  by the Supreme Court in Maislin Industries, U.S., Inc. v. Primary

20  Steel, Inc., 497 U.S. 116 (1990).  MOL Br. at 35.  In Maislin, a

21  motor common carrier privately negotiated rates with a shipper that

22  were lower than its tariff rates, i.e., the rates the carrier had

23  filed with the Interstate Commerce Commission ("ICC").  497 U.S. at

24  122-23.  The carrier later declared bankruptcy and the bankruptcy

25  _____

26  [12] MOL also asserts an alternative claim for dead freight.  The
    claim was alleged in the event that SeaMaster US and Summit US

27  successfully disclaimed responsibility for shipments involving
    Centurion and, as a result, they failed to meet the minimum

28  quantity commitments under their service contracts with MOL.  As
    the Court declines to allow SeaMaster US to disclaim the Centurion
    shipments, see CL § III infra, this claim is moot.

trustee brought suit against the shipper to recover the difference between the tariff rates and the rates actually charged by the carrier.  Id. at 123.  The Supreme Court held that the Interstate Commerce Act strictly forbid motor carriers from deviating from their published tariffs.  Id. at 127-28.  This filed rate doctrine "was deemed necessary to prevent carriers from intentionally misquoting rates to shippers as a means of offering them rebates or discounts."  Id. at 127.

MOL argues that the filed rate doctrine applies here because the Shipping Act (which relates to ocean carriage) and the Interstate Commerce Act (which relates to motor and rail carriage) so closely parallel each other in scope and purpose that the construction of one should apply to the other.  See MOL Br. at 35. Defendants respond that, pursuant to 46 U.S.C. § 41109(d), rates set forth in service contracts, such as the rates at issue here, are not subject to the filed rate doctrine.  SM Br. at 24-25. Defendants further argue that MOL's claim for freight undercharges is time-barred because SeaMaster US and Summit US cannot recover from their customers the additional freight charges that MOL now seeks.  Id. at 26.

The Court need not reach these issues because it finds that MOL has not established that it undercharged SeaMaster US or Summit US.  MOL's freight re-rating case is completely dependent on the TAG audit.  MOL asserts that the freight assessments rendered by the TAG auditors are more reliable than the freight assessments rendered in the first instance by MOLIPS, the MOL subsidiary responsible for rating freight.  However, the evidence suggests just the opposite.  See FF ¶¶ 86-89 supra.

**United States District Court**
For the Northern District of California

MOLIPS had experience rating MOL shipments and also had procedures in place to ensure that its ratings were correct.  Id. ¶ 84.  Internal MOL audits conducted before this litigation did not reveal any problems in MOLIPS assessments for SeaMaster US and Summit US shipments.  Id.  MOLIPS also had direct access to the shipping information provided SeaMaster US and Summit US, whereas the TAG auditors acquired this information second hand.  Id. ¶ 87.  Despite MOLIPS's superior experience and information, TAG never contacted anyone at MOLIPS to determine how it calculated freight in the first instance.  Id. ¶ 88.  It appears that the TAG auditors may have cut corners in auditing SeaMaster US and Summit US shipments.  Id. ¶ 86.  Additionally, some of the results of the TAG audit are internally inconsistent.  Id. ¶ 89.  For example, two auditors reviewing the same shipment sometimes reached different conclusions.  Id.

These inconsistencies point to a larger problem with MOL's freight re-rating case.  They show that rating shipments often involved judgment calls.  Id.  Raters sometimes needed to choose between multiple rates, each of which could potentially apply to a particular shipment.  Id. ¶ 81.  Where one rating category was more specific than another, the more specific rate was to apply.  Id.  Where two specific rates equally applied, SeaMaster US and Summit US were entitled to the lower rate.  Id.  It was not always clear which rate category was the most specific or applicable.  Even if the filed rate doctrine does apply to the shipments at issue, MOL has cited no authority suggesting that it can be used to revisit such judgment calls.  Holding that the filed rate doctrine applies in cases such as this could require courts to review judgment calls

**United States District Court**
For the Northern District of California

concerning thousands of shipments, or more.  In this case alone, MOL has asked the Court to sift through over 19,000 rating decisions, each unique in its own way.

The issue of the GDSM rating category is illustrative.  The term is not defined in the SeaMaster Service Contracts, and various definitions are used in the ocean transportation business.  See FF ¶¶ 91-93 supra.  Thousands of SeaMaster US and Summit US shipment were rated as GDSM and there did not appear to be any disagreement about the term's definition during the relevant period.  See id. ¶¶ 90, 94.  Jerry Huang, who negotiated the service contracts on behalf of SeaMaster, testified that GDSM was intended to be a catch-all category, and there is no indication that anyone from MOL thought otherwise until this lawsuit was filed.  Id. ¶ 94.  Now MOL asks the Court to define the term as a category of commodities found in big-box stores (whatever those commodities might be) and then to apply that definition to thousands of shipments.

In any event, the evidence suggests that Defendants' definition of GDSM is the right one.  In 2008 and 2009, the parties wrote and amended the service contracts to include hundreds or thousands of GDSM rates.  FF ¶ 96 supra.  MOL argues that the parties actually intended to use the Group A as the catch all category, but few commodities were ever rated as Group A in 2008 or 2009.  See id. ¶¶ 95-96.  When the GDSM rates were removed from the service contracts in 2010, the parties began to frequently use the Group A and the newly created Group B rating categories.  Id. ¶ 96. All of these practices suggest that MOL, SeaMaster US, and Summit US agreed to use GDSM as a catch-all term in 2008 and 2009,

72

**United States District Court**
For the Northern District of California

subsequently replacing GDSM with Group A and Group B in 2010.  The Court declines to upset that understanding now.

The Court is more sensitive to MOL's allegations that SeaMaster US and Summit US misrepresented the contents of their sealed cargo containers in order to obtain lower freight rates.  However, MOL has presented almost no evidence to substantiate these allegations.  Instead, they have merely pointed to a handful of differences between the cargo descriptions provided in MOL's master bills of lading and the SeaMaster's house bills of lading.  FF ¶¶ 97-100 supra.  It is unclear whether these differences are due to incorrect information provided by SeaMaster US and Summit US or to decisions made by MOL's rating team.  Id.  In any event, most of these differences appear to be inconsequential.  Id.

In sum, it is not clear that MOL undercharged SeaMaster US and Summit US for any of the shipments moving under the SeaMaster Service Contracts.  Accordingly, the Court finds for SeaMaster US and Summit US on MOL's claims for violation of the Shipping Act, breach of maritime contract, and accounting.[13]

## III. **DAMAGE AWARD**

As set forth above, the Court finds against SeaMaster US, Summit US, and Kesco Container on MOL's claims for intentional misrepresentation, negligent misrepresentation, and conspiracy with respect to the Shenzhen door arrangement.  The Court finds that the appropriate damage award for these claims is equivalent to the

---

[13] In the freight re-rating case, SeaMaster US and Summit US asserted four counterclaims against MOL.  '91 Case ECF No. 38.  All but one of these counterclaims appear to have been abandoned.  As the Court finds for SeaMaster US and Summit US, their one remaining counterclaim for recoupment of any damages paid to MOL is now moot.

total amount of MOL's payments to Rainbow over the course of the

Shenzhen door arrangement and that MOL has presented credible

evidence of these payments.  See Exs. P-262, P-263, P-264, P-273.

Based on this evidence, the Court finds that SeaMaster US is liable

for $1,080,073.07 in damages and Kesco Container and Summit US are

jointly and severally liable for $8,284,393.11 in damages.[14]  See

FF ¶¶ 52, 63 supra.

The parties have proposed a number of alternative damage

figures which the Court now rejects.  Defendants propose that the

Court offset MOL's damages by any amounts that Defendants paid MOL

for the non-existent trucking.  Under California law, "[s]etoff

will not be permitted when it would be inequitable or contrary to

public policy to do so."  Fed. Deposit Ins. Corp. v. Bank of Am.

Nat. Trust & Sav. Ass'n, 701 F.2d 831, 836-37 (9th Cir. 1983).

Here, Defendants' trucking payments to MOL were a key part of the

fraud.  The payments were made to conceal the fact that no trucking

---

[14] MOL set forth its payments to Rainbow in several spreadsheets,
Exs. P-262, P-263, P-264, Ex. P-273.  MOL's internal auditor,
Warren Minck, testified at length about these spreadsheets and the
data on which they are based.  See Tr. at 458-537.  In its post
trial brief, MOL provided a table based on these spreadsheets that
breaks down MOL's damages per year.  MOL Br. Apx. G.  Defendants
were provided with an opportunity to respond to MOL's damage
proposal, see SM Damages Br., and the Court addresses Defendants'
concerns below.  The damage award set by the Court is based on the
proposed damages set forth in MOL's post-trial brief, MOL Br. Apx.
G, with a few alterations.  First, in addition to payments to
Rainbow, MOL also seeks "extra" origin receiving charges due under
its service contracts.  The Court declines to award these
additional origin receiving charges for the reasons set forth
below.  Second, MOL seeks an additional $377,793.59 and $302,916.03
in damages from SeaMaster for the years 2007 and 2008,
respectively.  Because MOL failed to present credible evidence that
SeaMaster was involved in the Shenzhen door arrangement prior to
2009, the Court declines to award these damages.  Third, MOL seeks
$75,970.51 in damages from "Kesco" for 2011 Shenzhen door
shipments.  The Court declines to award this amount since the
evidence adduced at trial shows that the Shenzhen door arrangement
terminated in June 2010.

1   was actually taking place and Defendants were ultimately reimbursed

2   for these payments through a series of kickbacks.  The Court finds

3   that it would be inequitable to credit Defendants for payments made

4   to cover up their fraud.

5       SeaMaster US also disclaims responsibility for a number of

6   Shenzhen door shipments booked by Centurion under SeaMaster US's

7   service contract with MOL.  SM Damages Br. at 4.  Defendants now

8   claim that Centurion was misusing SeaMaster US's service contracts

9   and booking shipments without authorization.  See id.  The Court

10  finds this argument unpersuasive.  In July 2009, MOL identified a

11  number of shipments booked by Centurion under SeaMaster's service

12  contract and asked SeaMaster if those shipments were appropriate.

13  FF ¶ 64 supra.  SeaMaster made no attempt to disclaim the Centurion

14  shipments at that time.  Id.  As such, its attempt to disclaim them

15  now is not credible.

16      MOL proposes that, in addition to its payments to Rainbow, it

17  should also recover the difference between the origin receiving

18  charges actually billed to Defendants and the origin receiving

19  charges that would have been billed had Defendants not

20  misrepresented the origin of their cargo.  This proposal is

21  inequitable.  Under the damage award set forth by the Court,

22  Defendants will essentially reimburse MOL for all payments MOL made

23  to Rainbow, even though Defendants have already partially

24  reimbursed MOL through the arbitraries they paid over the course of

25  the Shenzhen door arrangement.  Under MOL's proposal, Defendants

26  would pay for a portion of the Rainbow payments for a third time.

27      MOL also seeks disgorgement of Defendants' ill-gotten gains as

28  well as punitive damages.  MOL suggests that the Court calculate

**United States District Court**
For the Northern District of California

the ill-gotten gains by multiplying MOL's payments to Rainbow by eleven, since Toll acquired TriDec, SeaMaster US and Summit US's parent company, for eleven times its earnings before interest and tax.  See FF ¶ 34 supra.   There are several problems with this methodology.  First, the proceeds of the TriDec sale went to TriDec's shareholders, not to SeaMaster US or Summit US.  Id. Second, the methodology is based on the assumption that SeaMaster US and Summit US received all payments made to Rainbow over the course of the Shenzhen door arrangement.  This is simply not true. Other players were involved, including Kesco Container, and the only gains that Defendants made from the scheme were lower origin handling charges and free space protection.  Presumably, some of these gains were passed along to Defendants' customers in the form of lower prices.  Third, since the Court has chosen not to offset Defendants' damages by their prior trucking payments to MOL, MOL is already receiving more than it lost as a result of the Shenzhen door arrangement.  Accordingly, the Court declines to further multiply MOL's damages or award additional punitive damages.

Finally, MOL seeks pre-judgment interest.  Under California law, the trier of fact has the discretion to award pre-judgment interest in cases involving oppression, fraud, or malice.  Cal. Civ. Code § 3288; Nathanson v. Murphy, 132 Cal. App. 2d 363, 373 (Cal. Ct. App. 1955).  Pre-judgment interest is awarded to compensate a party for the loss of the use of his or her property. Bullis v. Sec. Pac. Nat. Bank, 21 Cal. 3d 801, 815 (Cal. 1978). The rate for pre-judgment interest in California is 7 percent. Bullock v. Philip Morris USA, Inc., 198 Cal. App. 4th 543, 573 (Cal. Ct. App. 2011).  The Court exercises its discretion and

1  declines to award pre-judgment interest here.  As set forth above,

2  the damages set by the Court already award MOL for more than it

3  lost as a result of the Shenzhen door arrangement.

4  ///

5  ///

6  ///

7  ///

8  ///

9  ///

10 ///

11 ///

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CONCLUSION**</u>

As to Case Number 11-cv-02861-SC, the trucking case, the Court finds for Plaintiff Mitsui O.S.K. Lines ("MOL") and against Defendants Kesco Container Lines, Inc. ("Kesco Container"), SeaMaster Logistics, Inc. ("SeaMaster US"), and Summit Logistic International, Inc. ("Summit US") on MOL's claims for intentional misrepresentation, negligent misrepresentation, and conspiracy to commit intentional misrepresentation.  Based on these findings, the Court awards MOL $9,364,466.18 in damages.  SeaMaster US is liable for $1,080,073.07 in damages and Kesco Container and Summit US are jointly and severally liable for $8,284,393.11 in damages.  The Court DISMISSES WITH PREJUDICE all claims asserted against Defendant Kesco Shipping, Inc.  The Court also DISMISSES WITH PREJUDICE MOL's RICO claims as to all Defendants, as well as Defendants' counterclaims against MOL.

As to Case Number 10-cv-05591-SC, the freight re-rating case, the Court finds for Defendants SeaMaster US and Summit US on MOL's claims for breach of maritime contract, violation of the Shipping Act, and accounting.  All claims and counterclaims asserted in this action are DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

Dated:  March 21, 2013

_____
UNITED STATES DISTRICT JUDGE