United States District Court
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9    MITSUI O.S.K. LINES, LTD.,        )  Case Nos.  11-cv-02861-SC
                                       )             10-cv-05591-SC
10              Plaintiff,             )
                                       )
11        v.                           )  ORDER ON REMAND FROM THE NINTH
                                       )  CIRCUIT
12   SEAMASTER LOGISTICS, INC.,        )  
     SUMMIT LOGISTICS INTERNATIONAL,   )
13   INC., KESCO CONTAINER LINE,       )
     INC., KESCO SHIPPING, INC., and   )
14   DOES 1 through 20,                )
                                       )
15              Defendants.            )
                                       )
16   _____)

17

18        On March 21, 2013, following a trial, the Court issued its

19   Findings of Facts and Conclusions of Law ("FFCL") in a single

20   opinion covering two consolidated cases: the "Freight Case" (No.

21   10-cv-05591-SC) and the "Trucking Case" (No. 11-cv-2861-SC).  ECF

22   No. 261 ("FFCL").  Defendants SeaMaster Logistics, Inc.

23   ("SeaMaster") and Summit Logistics International, Inc. ("Summit")[1]

24   appealed the Judgment in the Trucking Case, and Plaintiff Mitsui

25   O.S.K. Lines ("MOL") cross-appealed.  Defendants Kesco Container

26   Line, Inc. and Kesco Shipping, Inc. ("Kesco") did not appeal.  On

27   _____

28   [1] Summit was subsequently renamed Toll Global Forwarding
     (Americas), Inc. ("Toll").

July 6, 2015, the Ninth Circuit issued a Memorandum Disposition affirming the finding of misrepresentation against SeaMaster and Summit, reversing the damages award to MOL and remanding for recalculation, reversing the award of attorney's fees to MOL, reversing the dismissal of MOL's RICO claim and remanding with instructions to apply the test set forth in United States v. Chao Fan Xu, 706 F.3d 965, 974 (9th Cir. 2013), and affirming the Court's conclusions on alleged co-conspirator liability.  Now before the Court are the two issues remanded for further proceedings: (1) recalculation of damages and (2) reconsideration of MOL's RICO claim.

On September 4, 2015, the parties submitted their opening briefs on those two issues.  ECF Nos. 339 ("Def. Opening Br."), 340 ("Pl. Opening Br.").  Response briefs were submitted on September 11, 2015.  ECF Nos. 345 ("Pl. Response Br."), 346 ("Def. Response Br.").  Pursuant to Local Rule 7-1(b), the Court finds this matter suitable for resolution without oral argument.  After reviewing the Ninth Circuit's Opinion and the parties' briefs and supporting papers, the Court finds as follows:

1. MOL's RICO claim is DISMISSED WITH PREJUDICE

2. The Court AWARDS MOL damages against SeaMaster in the amount of $1,151,205

3. The Court AWARDS MOL damages against Summit in the amount of $2,122,374

## I.   BACKGROUND

The facts are set out in detail in the FFCL.  In pertinent part, they are as follows:

///

United States District Court
For the Northern District of California

Defendants engaged in a conspiracy to induce MOL to pay for fake truck moves between factories in inland China, typically Shenzhen, to ports in and around Hong Kong.  This so-called "Shenzhen door arrangement" was managed and organized by Michael Yip, the head of MOL's Hong Kong office, without MOL's knowledge or authorization.  Yip struck a deal with Defendants: He would provide them with more space on MOL's ships and lower surcharges ("origin receiving charges"), and, in return, Defendants would request that MOL book truck moves from inland factories to Hong Kong ports through Rainbow Transportation Co. Ltd. ("Rainbow"), a fake trucking company suggested by Yip.  Due to a complicated paper trail and a series of payments and kickbacks, it appeared that Rainbow was actually providing trucking, but, in reality, Defendants or their customers made other arrangements to move their goods from the factory to the port.  The end result was guaranteed space and lower origin receiving charges for Defendants and revenues for Rainbow.

### A.    The Ocean Transportation Business

Licensed vessel-operating common carriers ("VOCCs") like MOL operate ships that carry cargo over water between foreign ports and the United States.  46 U.S.C. §§ 40102(6), (17).  A VOCC issues a bill of lading evidencing the particulars of the shipment.  A VOCC bill of lading is often referred to as the "master bill of lading."

Non-vessel-operating common carriers ("NVOCCs") like SeaMaster US, Summit US, and Kesco Container contract with the public to provide transportation of cargo by water between foreign ports and the United States.  The NVOCC assumes responsibility for the transportation from the place of receipt to the place of delivery

**United States District Court**
For the Northern District of California

1   stated on its bill of lading, which is referred to as the "house

2   bill of lading."  The NVOCC does not, however, operate ocean

3   vessels.  An NVOCC obtains space on a VOCC's vessel and re-sells

4   that space to its own customers.

5       VOCCs and NVOCCs sometimes contract to carry cargo overland,

6   either from an inland place of receipt to the port of loading or

7   from the port of discharge to an inland place of delivery, or both.

8   Carriage that includes both an inland leg and an ocean leg is

9   called "through" or "intermodal transport."  See 46 U.S.C. §

10  40102(25).  Thus, VOCCs and NVOCCs may offer carriage of cargo from

11  port to port, from door to door (e.g., from an inland point of

12  origin in Asia to a final inland destination in the United States),

13  from door to port, or from port to door.

14      In providing intermodal transport, the VOCC or NVOCC may

15  utilize the services of subcontractor railroads, truckers, and

16  other inland carriers.  For example, an NVOCC may provide

17  transportation service from Shenzhen, China to Las Vegas, Nevada by

18  utilizing a motor carrier in China for the Shenzhen to Hong Kong

19  leg (a.k.a. a "door move" or "truck move"), an ocean carrier from

20  Hong Kong to Oakland, California, and a motor carrier in the United

21  States for the Oakland to Las Vegas leg.  In this example, the

22  VOCC's master bill of lading would show the port of Hong Kong as

23  the place of receipt and the port of Oakland as the place of

24  delivery.  The NVOCC's house bill of lading would show Shenzhen as

25  the place of receipt and Las Vegas as the place of delivery.  The

26  VOCC could offer this same intermodal transport.

27      **B.    The Parties and Key Players**

28      Plaintiff MOL is a Japanese VOCC.  MOL uses general agents to

4

United States District Court
For the Northern District of California

perform its operational functions in Asia and in the United States. MOL (HK) Agency Ltd. ("MOL HK") is MOL's general agent subsidiary for its "South China territory," which encompasses a number of provinces and cities in South China, including Shenzhen, as well as Hong Kong.  Exs. D-519, D-526, D-527; Tr. 1964-65.  MOL HK is based in Hong Kong.

Yip Kwok-Wai, a.k.a. Michael Yip, was the district director of MOL HK from sometime in 2009 through 2011, and before that he was MOL's General Manager of Sales and Customer Service for Hong Kong and South China.  Tr. at 1962-65.  As district director of MOL HK, Yip was in charge of MOL's Hong Kong and South China Sales team, which allocated shipping space among MOL's customers.  Tr. at 2040. Yip was the mastermind behind the fraud in this case, though he was not a party to this action.

Defendant Kesco Container was incorporated in New York in 1994 and primarily deals with ocean freight business.  Tr. at 1748. In or around 1995, the Kesco partners entered into an agreement to become the air freight handling agent for a company known as Fashion Merchandising, Inc. ("FMI"), which performed warehousing and trucking services for a number of garment manufacturers.  Tr. at 1750.  In 1997, Kesco Container began to service FMI's ocean transportation needs.  Id.  Around that time, FMI developed a direct customer relationship with the Jones Apparel Group ("Jones Apparel"), a large, well-known garment company.  Id.  As a result, FMI became Kesco's biggest customer, comprising over 50 percent of its business.  Tr. at 1750-51.

In or around 2006, a group of companies known as the Summit Group, acquired FMI for approximately $114 million.  Tr. at 1435-

36.   The Summit Group informed the Kesco partners that it intended to take over the Jones Apparel business, and the Kesco partners agreed to cooperate with the transition.   Tr. at 617.   In the early stages of the transition, Kesco was to be the origin handling agent in Asia for the Jones Apparel business, and the Summit Group was to take over the role of sales agent and destination handling agent in the United States.   Tr. at 1038-43.   The transition ultimately culminated in a joint venture between the Kesco partners and Summit US in 2009.

The Summit Group was created in 2006 and formed a number of subsidiaries, including two companies which would later become Defendants SeaMaster US and Summit US.   The Summit Group also acquired Kesco's key partner, FMI.   Summit US ran the retail side of the NVOCC business and ultimately took the Jones Apparel business away from Kesco.

### C.   The Shenzhen Door Arrangement

The Shenzhen door arrangement was conceived sometime in 2000 when Jones Apparel's need for ocean services increased significantly.   Tr. at 634-36.   FMI used Kesco's NVOCC services to secure ocean transportation for Jones Apparel cargo.   FF ¶¶ 17, 20-21 supra.   There were various discussions at Kesco and FMI about strategies for obtaining the freight rates needed to secure the Jones Apparel business and also obtaining "adequate space protection," an arrangement to ensure that MOL reserved adequate space for Jones Apparel cargo on its ships.   Tr. at 634-35.   Cheng, who was then assistant general manager of Kesco Container HK, took these concerns to Yip at MOL, and Yip recommended the Shenzhen door arrangement.   Tr. at 1012-1013.

Under the arrangement, Yip agreed to provide space protection for Kesco cargo.  Tr. at 1012, 1019.  In return, Cheng agreed that Kesco would declare false Shenzhen door shipments, meaning that Kesco would request that MOL arrange trucking for Kesco cargo between inland origins, typically Shenzhen, and ports in and around Hong Kong.  Id.  In reality, Kesco did not require any trucking from MOL, because the cargo was tendered by the manufacturer or exporter at the port.  Tr. 634-36, 1012.  Cheng also agreed that Kesco would pay MOL an "arbitrary," an additional charge for the trucking between Shenzhen and the port.  Yip agreed that Kesco would be fully reimbursed for that arbitrary.  Finally and most importantly, Cheng agreed to nominate Rainbow Transportation Co. Ltd. ("Rainbow"), a Hong Kong trucking company suggested by Yip, to perform the purported truck moves.  Tr. at 1014; Ex. P-84.

MOL paid Rainbow for the door moves, but in reality, Rainbow never performed any trucking.  Tr. at 1013-14, 2127-29.  Instead, it merely received payments from MOL and made payments to Kesco Container HK.  Kesco Container HK, in turn, would kick back funds to Kesco Container US, which ultimately paid MOL for the door moves.  MOL took a loss on the trucking leg of the Shenzhen door moves, meaning that MOL paid more to Rainbow than it charged Defendants for trucking.  See Tr. 606-607; Ex. D-595.  Thus, Rainbow received more from MOL than it paid to Defendants.

The master bills of lading issued by MOL reflected a false "Shenzhen door" place of receipt.  Tr. at 1016, 1100.  Kesco did not over-charge its own customers as a result of the arrangement and the house bills of lading issued by Kesco to its customer accurately represented the true place of receipt.  See, e.g., Ex.

1   P-111.  The Court also found that Kesco did not share these house

2   bills of lading with MOL or inform MOL that its master bills of

3   lading were incorrect.

4        SeaMaster did not enter into the Shenzhen door arrangement

5   until early 2009.  Tr. at 1545-46.  Around that time, Huang was

6   concerned that MOL was not providing enough vessel space for

7   SeaMaster's shipments to the United States.  Tr. at 1542.  Huang

8   met with Yip in Hong Kong in early 2009, at which time Yip

9   indicated that he could solve SeaMaster's space problem if Huang

10  agreed to the Shenzhen door arrangement.  Tr. at 1544-45.  The

11  arrangement proposed by Yip was substantially similar to the one he

12  had proposed to Cheng nine years earlier: SeaMaster would declare

13  false Shenzhen door shipments and pay an arbitrary for the non-

14  existent trucking, and in return Yip would provide space protection

15  and a trucking company would reimburse SeaMaster for the arbitrary.

16  Tr. at 1545-46.  As in the arrangement with Cheng, SeaMaster was

17  able to obtain lower origin receiving charges by booking Hong Kong

18  port shipments as Shenzhen door shipments.  Id. at 1594.  Between

19  2009 and 2010, SeaMaster booked thousands of shipments through the

20  Shenzhen door arrangement.  Ex. P-263.  SeaMaster booked these

21  shipments through its offices in Hong Kong.  Tr. at 1561-62.

22       As a result of the information provided by SeaMaster, MOL

23  issued master bills of lading that incorrectly identified

24  shipments' place of receipt as Shenzhen.  See, e.g., Ex. P-129.

25  The house bills of lading that SeaMaster issued to its own

26  customers correctly identified a port place of receipt, not

27  Shenzhen.  See e.g., id.; Tr. at 1567.  SeaMaster did not

28  ///

overcharge its own customers as a result of the Shenzhen door arrangement.  See Tr. at 1567.

**D.   <u>The Trucking Case</u>**

In the Trucking Case, MOL asserted federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, as well as claims for intentional and negligent misrepresentation and civil conspiracy.

Because RICO does not apply extraterritorially, the Court first had to determine whether Defendants' RICO claims were based on acts committed in the United States.  The Court applied the "nerve center test," which focuses on "the brains rather than the brawns of the enterprise and examines the decisions effectuating the relationships and common interest of the enterprise's members, and how those decisions are made."  FFLC at 63-64 (quotations omitted).  The Court found that "the brains" of the enterprise in this case were clearly outside of the United States:

> [T]he Shenzhen door arrangement was set up in Hong Kong by Yip, Cheng, and Huang.  All three of these individuals worked in Hong Kong and directed the arrangement from Hong Kong.  The Shenzhen door shipments were booked in Hong Kong.  Rainbow, the key to the entire arrangement, was also located in Hong Kong.

<u>Id.</u> at 64.  As a result, the Court dismissed MOL's RICO claims with prejudice.  <u>Id.</u>

On MOL's claims for intentional misrepresentation, negligent misrepresentation, and conspiracy to commit international misrepresentation, the Court found in favor of MOL and against Defendants Kesco Container, SeaMaster US, and Summit US.

As to damages, the Court found that the appropriate award was equivalent to the total amount of MOL's payments to Rainbow over

the course of the Shenzhen door arrangement.  The Court rejected Defendants' proposal to offset MOL's damages by the amounts that Defendants paid MOL for the non-existent trucking, holding that it would be inequitable to do so.  Id. at 74-75 ("The Court finds that it would be inequitable to credit Defendants for payments made to cover up their fraud.").  The Court also declined to award punitive damages and pre-judgment interest.  Id. at 76-77.

**E.   Issues on Remand**

On appeal, the Ninth Circuit reversed and remanded the Court's dismissal of MOL's RICO claim for failure to apply the "pattern of racketeering" test for extraterritoriality set out in United States v. Chao Fan Xu:

> The district court applied a "nerve center" test when it dismissed MOL's RICO claim.  However, in [United States v. Chao Fan Xu], this Court explicitly rejected that test, explaining that the test to determine whether a RICO application is extraterritorial is to look "not upon the place where the deception originated," but "at the pattern of Defendants' racketeering activity taken as a whole."  Thus, even if racketeering activity is "conceived and planned overseas," it may still fall within the ambit of the statute if "it was executed and perpetuated in the United States."  The district court therefore erred when it applied the nerve center test.

Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc., No. 13-15848, 2015 WL 4071527, at *2 (9th Cir. July 6, 2015) (internal citations omitted).

///

///

///

///

///

///

**United States District Court**
For the Northern District of California

1     The Ninth Circuit also reversed and remanded the Court's

2  calculation of damages based on the total amount that MOL paid

3  Rainbow:

> The district court erred by . . . failing to use a
> reasonable basis of computation to calculate the actual
> damages incurred by MOL for reimbursed trucking costs,
> origin receiving charge differentials, and lost space
> protection premiums.

7  Id., at *1.

8

9  II.   **LEGAL STANDARD**

10     A.   **RICO**

11     RICO does not apply extraterritorially.  Chao Fan Xu, 706 F.3d

12  at 974.  Whether an alleged RICO violation is extraterritorial

13  turns on whether there are enough predicate acts in the United

14  States to establish a "pattern of racketeering activity."  See id.

15  at 978.  A RICO claim is not considered extraterritorial where a

16  racketeering enterprise was "executed and perpetuated in the United

17  States," where the relevant acts in the United States

18  "consummate[d] the purpose of the enterprise," or where the acts

19  committed overseas would have been "a dangerous failure" if not for

20  the acts committed in the United States.  Id. at 979.

21     B.   **Damages**

22     "[R]ecovery in a tort action for fraud is limited to the

23  actual damages suffered by the plaintiff."  Ward v. Taggart, 336

24  P.2d 534, 537 (Cal. 1959).  Further, the law "requires that some

25  reasonable basis of computation be used."  Allen v. Gardner, 272

26  P.2d 99, 102 (Cal. Ct. App. 1954).

27  ///

28  ///

**III.   DISCUSSION**

    **A.   RICO**

To establish RICO liability a plaintiff must prove "conduct" of an "enterprise" through a "pattern" of "racketeering" activity. Sedima, S.P.R.L. v. Imrex Co., Inc. 473 U.S. 479, 496 (1985); Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007).   The RICO statute, however, does not have extraterritorial reach.   Chao Fan Xu, 706 F.3d at 974.   Thus, a court need not reach the elements of RICO if the relevant pattern of racketeering activity occurred outside of the United States.   Id.

In United States v. Chao Fan Xu ("Xu"), the Ninth Circuit held that the test to determine whether a RICO application is extraterritorial is to look "at the pattern of Defendants' racketeering activity taken as a whole."   Id. at 977-79.   The Court rejected the alternative "nerve center test," which assesses extraterritoriality according to the geographical location of "the brains" of the enterprise.   The court noted, however, that the geographical location of a racketeering enterprise might still be relevant in some cases.   Id. at 977.   In fact, the court specifically mentioned this case as one such example.   Id. ("The geographic location of an enterprise may be relevant under certain factual scenarios, like the . . . schemes at issue in . . . Mitsui O.S.K. Lines.").

The criminal racketeering enterprise at issue in Xu had two parts.   The first part involved diverting funds from the Bank of China to a holding company in Hong Kong, which was conducted "predominantly" in China.   As to this activity, the court held that it was beyond the reach of RICO.   Id. at 978.   The second part of

12

United States District Court
For the Northern District of California

the enterprise, however, involved racketeering activities conducted within the U.S. that violated U.S. immigration laws, including using fraudulent visas and passports to enter the U.S., traveling within the U.S. to execute documents in furtherance of the immigration fraud, and opening bank accounts in the U.S., leading to defendants' arrest in the U.S.  The court held that while much the overall enterprise was in Asia (including the so-called "nerve center"), the RICO claims at issue were not extraterritorial because the racketeering enterprise was "executed and perpetuated in the United States," the relevant acts in the United States "consummate[d] the purpose of the enterprise," and the acts committed in Asia would have been "a dangerous failure" if not for the acts committed in the United States.  Id. at 979.

In its FFCL, the Court found that the Shenzhen door arrangement was set up in Hong Kong by Yip, Cheng, and Huang, that all three of these individuals worked in Hong Kong and directed the arrangement from there, that the Shenzhen door shipments were booked in Hong Kong, that Rainbow ("the key to the entire arrangement") was located in Hong Kong, and that although Summit, SeaMaster, and Kesco were U.S. corporations, their Hong Kong offices or agents ran the arrangement and their U.S. offices had very little involvement.  The domestic acts in this case -- to the extent there were any -- do not turn this essentially foreign arrangement, accomplished through foreign predicate acts, into a domestic U.S. RICO claim.

The domestic acts raised by MOL occurred after the fraud was complete: sending bills of lading to the U.S. with an incorrect place of receipt of Shenzhen, filing contracts with the Federal

**United States District Court**
For the Northern District of California

1 Maritime Commission that included in them fraudulent trucking
2 rates, and reporting information to U.S. Customs that falsely
3 included Shenzhen as the place of receipt for certain cargo.  These
4 acts were inconsequential when evaluating the Defendants' "pattern
5 of racketeering activity taken as a whole."  See id. at 977-79.
6 Unlike the domestic acts in Xu, the domestic acts raised by MOL did
7 not execute or perpetuate the racketeering enterprise in any
8 meaningful way.  See id. at 979.  Nor did they consummate the
9 purpose of the enterprise such that the activity in Hong Kong would
10 have otherwise been a failure.  See id.  Instead, the domestic acts
11 in this case occurred after the fraud had occurred in Hong Kong,
12 were not important to the Defendants' scheme, and were not
13 necessarily illegal insofar as they did not satisfy all the
14 elements of wire or mail fraud.  As a result, they do not
15 constitute predicate acts for the purposes of a RICO violation.
16 Moreover, even if these acts did amount to mail and wire fraud,
17 they did not establish a pattern of domestic racketeering activity
18 sufficient to justify an application of the RICO statute to what
19 was a foreign scheme to defraud MOL.

20     Separate but related, MOL's RICO claim also fails because the
21 domestic acts raised by MOL were not the proximate cause of its
22 damages.  In Hourani v. Mirtchev, 943 F. Supp. 2d 159 (D.D.C.
23 2013), the plaintiff alleged RICO claims for extortion, money
24 laundering, and other crimes in connection with the takeover of
25 plaintiff's media businesses in Kazakhstan.  The district court,
26 applying the Xu pattern of racketeering test, dismissed the
27 complaint on the ground that it sought extraterritorial application
28 of RICO.  The court agreed that the claims had some domestic U.S.

1  contact: the individual plaintiff and defendant were both U.S.
2  citizens, the defendant approved of the extortion scheme from the
3  U.S., and the defendant corporation received payment in U.S. bank
4  accounts for participating in the extortion.  But the court
5  concluded that these U.S. contacts were too isolated and peripheral
6  to support a RICO claim and did not change the "essentially
7  foreign" nature of the activity in that case.  Id. at 165-67.  In
8  particular, the court held that the RICO claims were
9  extraterritorial because the U.S. activity did not proximately
10  cause the injuries alleged.  Id. at 167; see also Hemi Grp. LLC v.
11  City of New York, 559 U.S. 1 (2010) (dismissing a RICO claim
12  because the alleged predicate acts were not the proximate cause of
13  the plaintiff's injuries); Republic of Iraq v. ABB AG, 920 F. Supp.
14  2d 517, 549 (S.D.N.Y. 2013) (same).

15      Thus, to avoid dismissal, MOL must show that the U.S.-based
16  activity proximately caused its damages.  "[W]hen a court evaluates
17  a RICO claim for proximate causation, the central question it must
18  ask is whether the alleged violation led directly to the
19  plaintiff's injuries."  Anza v. Ideal Steel Supply Corp. 547 U.S.
20  451, 461 (2006).

21      The booking misrepresentations from SeaMaster and Summit in
22  Hong Kong to MOL in Hong Kong, leading to the payments by MOL in
23  Hong Kong to Rainbow in Hong Kong, was the proximate cause of the
24  loss to MOL.  The subsequent sending of the bills of lading or bill
25  of lading data to the U.S. did not cause the loss; indeed, there is
26  no evidence that anyone attached any importance to those acts.

27      The cases on which MOL relies are inapposite.  United States
28  v. Rude is not a RICO case.  88 F.3d 1538 (9th Cir. 1996).  The

**United States District Court**
For the Northern District of California

1   question in Rude was whether there was sufficient evidence to

2   support a conviction for wire fraud, where funds were wired from

3   Hawaii to Switzerland, and then to the defendants in Seattle, and

4   then partially back to Hawaii.  The case shows what constitutes a

5   single scheme for purposes of a wire fraud, but it does not show

6   when wire fraud is the proximate cause of a RICO violation.  United

7   States v. Jinian, 725 F.3d 954 (9th Cir. 2013) and United

8   States v. Redcorn, 528 F.3d 727 (10th Cir. 2008) are not on point

9   for the same reason.  Bridge v. Phoenix Bond & Indemnity Co. does

10  not support MOL's argument either.  553 U.S. 639 (2008).  The issue

11  in Bridge was whether a domestic mail fraud could support a

12  domestic RICO claim when the plaintiff did not rely on the

13  defendant's misrepresentations.

14       In short, MOL's RICO claim is precluded as extraterritorial

15  under the Xu test because the domestic acts raised by MOL did not

16  constitute a "pattern of racketeering activity."  Further, the

17  predicate acts that took place in Hong Kong, including the booking

18  misrepresentations and associated activity, were the proximate

19  cause of MOL's damages -- not the alleged wire and mail fraud.

20  Accordingly, MOL's RICO claim is DISMISSED WITH PREJUDICE.

21       **B.   Damages**

22       On remand, the Ninth Circuit has asked the Court to

23  recalculate the actual loss to MOL based on trucking costs, origin

24  receiving charge differentials, and lost space protection premiums.

25  The parties agree on the amount of lost trucking costs and the

26  amount of origin receiving charge differentials.  They do not agree

27  on whether MOL has proved an amount for lost space protection

28  premiums.  As to punitive damages and prejudgment interest, MOL did

1  not appeal, and the Ninth Circuit's decision does not reopen, this
2  Court's denial of those damages claims.

3         **1.**   **Trucking Costs**

4       The Court found that SeaMaster made shipments under the
5  Shenzhen door arrangement from March 5, 2009 to June 30, 2010.  For
6  those shipments, MOL paid Rainbow a total of $1,080,073.  FFCL at
7  74.  For the same shipments, SeaMaster paid MOL $484,740 for the
8  purported Shenzhen door trucking.  Def. Opening Br. at 4; Pl.
9  Opening Br. at 8.  Thus, the net loss to MOL for trucking costs for
10  the SeaMaster shipments totals $595,333.

11       The Court found that Summit made shipments under the Shenzhen
12  door arrangement from May 25, 2008 to June 30, 2010.  For these
13  shipments, MOL paid Rainbow a total of $1,987,833.  Def. Opening
14  Br. at 5; Pl. Opening Br. at 8, 52.  For these same shipments,
15  Summit paid MOL a total of $1,233,063 for the purported Shenzhen
16  door trucking.  Id.  Thus, the net loss to MOL for trucking costs
17  for the Summit shipments totals $754,820.

18         **2.**   **Origin Receiving Charge Differentials**

19       The Shenzhen door arrangement allowed the Defendants to secure
20  lower surcharges known as "origin receiving charges."  But for the
21  Defendants' fraud, MOL would have received the full surcharge
22  amount.  Accordingly, MOL should be awarded the difference.

23       The parties agree that the origin receiving charge
24  differential equals $71,132 for SeaMaster and $134,491 for Summit.
25  Def. Opening Br. at 4-5; Pl. Opening Br. at 8.  These amounts
26  should be added to the total damage award.

27  ///

28  ///

### 3. <u>Space Protection</u>

In its FFCL, the Court found that MOL was damaged, in part, because Yip gave Defendants free space protection as part of the Shenzhen door arrangement, a service for which MOL generally charges a premium. FFCL at 60. The more difficult question is how to value MOL's loss in this regard given the lack of precise data on the price of space protection premiums during that time.

MOL argues that it would be reasonable for the Court to calculate the value of the space protection provided based on the amount that the Defendants were willing to pay to secure space protection through their fraudulent scheme. The Court agrees that in the absence of more precise data, a reasonable way to value a service such as space protection is to measure the Defendants' willingness to pay. MOL argues that Defendants' willingness to pay equals the amount that Defendants paid MOL for the fake trucking by Rainbow -- that is, the "arbitrary." The arbitrary paid to MOL does not express Defendants' willingness to pay, however, for at least two reasons. First, as a result of paying MOL the arbitrary, Defendants received more than just space protection; they also received lower origin receiving charges. As a result, the arbitrary would have to be reduced by the origin receiving charge differential. Second, and more importantly, Defendants received a full refund from Rainbow for the arbitraries they paid MOL. In other words, Defendants did not have to pay anything to receive space protection because the arbitrary was simply passed through MOL, to Rainbow, and then sent back to the Defendants. For that reason, the amount Defendants paid MOL for trucking arbitraries is ///

meaningless as a measure of the value of the space protection that
they received.

There appears to be no easy way to measure the value of the
space protection provided.  As MOL describes in its briefs, at
least part of this difficulty is a result of the Defendants'
illusive behavior.  See Pl. Response Br. at 13-14.  The difficulty
in calculating a precise damage amount does not mean, however, that
MOL should be denied all recovery.  As Witkin explains,

> The requirement that damages be "certain" and not
> "speculative" or "conjectural" is more important in
> contract than in tort actions . . . . [T]hough the fact
> of damage must be clearly established, the amount need
> not be proved with the same degree of certainty, but may
> be left to reasonable approximation or inference.

6 Witkin, Summary 10th (2005) Torts, § 1551, p. 1024; see also
Clemente v. State of Cal., 40 Cal. 3d 202, 219 (1985) (holding that
the injured party need only establish "the extent of the harm and
the amount of money that will represent adequate compensation with
as much certainty as the nature of the tort and the circumstances
permit").  Further, when a plaintiff's inability to prove damages
with certainty is due to a defendant's actions, the law normally
does not require such proof.  Clemente, 40 Cal. 3d at 219.

Here, MOL has provided some evidence of the range of prices
that were being charged for space protection or similar services
during the period of the Shenzhen door arrangement.  See Pl.
Opening Br. at 52-53.  MOL's estimates are hardly precise: they
range from $200 to $1,000.  Id.  Further, many of the price
estimates are not specifically for space protection.  For example,
MOL provided the price for dead freight -- the penalty a cargo
owner has to pay when it books a shipment but fails to ship it.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Even though dead freight is not the same as space protection,

2   however, the amount paid for dead freight is still informative

3   insofar as it reflects the price of reserving space in a container.

4   Thus, notwithstanding their imprecision, MOL's price estimates

5   provide a baseline against which the reasonableness of MOL's

6   proposed damages can be evaluated.

7       MOL has asked the Court to award it $484,740 in damages from

8   SeaMaster as compensation for the space protection it provided

9   during the Shenzhen door arrangement.  Seamaster was given space

10  protection for 3,998 containers.[2]  Thus, MOL is requesting $121.24

11  per container.  Because this amount falls below the $200-$1,000

12  range described above, the Court finds it to be a reasonable

13  estimate of the space protection premiums lost as a result of the

14  Shenzhen door arrangement.

15      MOL has asked the Court to award it $1,233,063 in damages from

16  Summit US as compensation for the space protection it provided

17  during the Shenzhen door arrangement.  Summit US was given space

18  protection on 8,053 containers.  Thus, MOL is requesting $153.11

19  per container.  Because this amount falls below the $200-$1,000

20  range described above, the Court finds it to be a reasonable

21  ///

22  _____

23  [2] Defendants dispute the premise that they were given space
    protection on all containers shipped under the Shenzhen door

24  arrangement.  The Court disagrees.  Regardless of whether
    Defendants needed space protection for every container, their

25  arrangement with Yip guaranteed that they would be provided with
    space on all containers.  But for the fraud, the Defendants would

26  have been charged a premium for this guarantee on every container.
    Further, the guarantee was valuable to the Defendants: it allowed

27  them to secure and retain their contracts with large clients such
    as Jones/Nine West insofar as it gave them a competitive advantage

28  over other NVOCCs who either could not obtain space protection or
    had to pay a premium for it.

estimate of the space protection premiums lost as a result of the Shenzhen door arrangement.

### 4. Damages Summary

In sum, the Court awards MOL the following in compensatory damages:

|  | Trucking Costs | ORC Differentials | Space Protection | TOTAL |
|---|---|---|---|---|
| SeaMaster | $595,333 | $71,132 | $484,740 | **$1,151,205** |
| Summit | $754,820 | $134,491 | $1,233,063 | **$2,122,374** |
| **TOTAL** | **$1,350,153** | **$205,623** | **$1,717,803** | **$3,273,579** |

## IV. CONCLUSION

For the foregoing reasons, the Court finds as follows:

1. MOL's RICO claim is DISMISSED WITH PREJUDICE

2. The Court AWARDS MOL damages against SeaMaster in the amount of $1,151,205

3. The Court AWARDS MOL damages against Summit in the amount of $2,122,374


IT IS SO ORDERED.


Dated: October  5 , 2015

_____

UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California